Filed:  September 11, 1997

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

---

No. 94-2200
(CA-93-3830-S)

---

William Runnebaum,

Plaintiff - Appellant,

versus

NationsBank of Maryland, N.A.,

Defendant - Appellee.

---

O R D E R

---

The Court amends its opinion filed August 15, 1997, as follows:

On the cover sheet, section 6, lines 1-2 -- the sentence is changed to begin "Judge Williams wrote the opinion . . . ."

On page 31, first full paragraph, line 6 -- "ante at 12" is corrected to read "ante at 11."

On page 33, first full paragraph, line 15 -- "Ante at 11" is corrected to read "Ante at 12."

On page 33, second full paragraph, line 2 -- "Ante at 12" is corrected to read "Ante at 11."

On page 39, first full paragraph, line 6 -- "ante at 14-15" is corrected to read "ante at 15."

On page 44, second full paragraph, line 10 -- "Ante at 19-20" is corrected to read "Ante at 20."

On page 44, footnote 10, line 2 -- "ante at 13-14" is corrected to read "ante at 13."

For the Court - By Direction


/s/ Patricia S. Connor
_____
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

WILLIAM RUNNEBAUM,
<u>Plaintiff-Appellant,</u>

v.

NATIONSBANK OF MARYLAND, N.A.,
<u>Defendant-Appellee.</u>

No. 94-2200

WHITMAN-WALKER CLINICAL LEGAL
SERVICES DEPARTMENT; EQUAL
EMPLOYMENT OPPORTUNITY
COMMISSION,
<u>Amici Curiae.</u>

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CA-93-3830-S)

Argued: March 5, 1997

Decided: August 15, 1997

Before WILKINSON, Chief Judge, and WIDENER, HALL,
MURNAGHAN, ERVIN, WILKINS, NIEMEYER, HAMILTON,
LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Williams wrote the
opinion, in which Chief Judge Wilkinson and Judges Widener, Wil-
kins, Niemeyer, and Luttig joined. Judge Hamilton wrote an opinion
concurring in the judgment. Judge Michael wrote a dissenting opin-
ion, in which Judges Hall, Murnaghan, Ervin, and Motz joined.

_____

**COUNSEL**

**ARGUED:** Gerard Patrick Martin, MARTIN, JUNGHANS, SNY-
DER & BERNSTEIN, P.A., Baltimore, Maryland, for Appellant. Eva
Susan Tashian-Brown, MCGUIRE, WOODS, BATTLE & BOOTHE,
Richmond, Virginia, for Appellee. **ON BRIEF:** Gregg L. Bernstein,
MARTIN, JUNGHANS, SNYDER & BERNSTEIN, P.A., Baltimore,
Maryland, for Appellant. Donald F. Burke, MCGUIRE, WOODS,
BATTLE & BOOTHE, Baltimore, Maryland, for Appellee. Daniel
Bruner, Senior Litigation Counsel, Elizabeth A. Seaton, Associate
Legal Services Director, Laura M. Flegel, Legal Services Director,
WHITMAN-WALKER CLINIC, INC., Washington, D.C., for
Amicus Curiae Whitman-Walker. C. Gregory Stewart, General Coun-
sel, J. Ray Terry, Jr., Deputy Attorney General, Gwendolyn Young
Reams, Associate General Counsel, Carolyn L. Wheeler, Assistant
General Counsel, Paul Bogas, EQUAL EMPLOYMENT OPPORTU-
NITY COMMISSION, Washington, D.C., for Amicus Curiae EEOC.

_____

**OPINION**

WILLIAMS, Circuit Judge:

We granted en banc review of this case to consider the appeal of
William Runnebaum, an asymptomatic individual infected with the
human immunodeficiency virus (HIV), from a district court order
granting summary judgment for NationsBank of Maryland on Runne-
baum's claims of discrimination under the Americans with Disabili-
ties Act (ADA), see 42 U.S.C.A. §§ 12101-12213 (West 1995 &
Supp. 1997); and the Employee Retirement Income Security Act
(ERISA), see 29 U.S.C.A. §§ 1001-1461 (West 1985 & Supp. 1997).
A divided panel of our court reversed the district court's grant of sum-
mary judgment, holding that Runnebaum established a prima facie
case of discrimination and forecast enough evidence to create "a gen-
uine issue of material fact as to whether he was fired because he was
regarded as having a disability." Runnebaum v. NationsBank of
Maryland, 95 F.3d 1285, 1297 (4th Cir. 1996). For the reasons that
follow, we hold that Runnebaum did not establish a prima facie case

2

of discrimination based on disability. Accordingly, we affirm the district court's grant of summary judgment for NationsBank.**1**

I. FACTS

Runnebaum was hired by NationsBank in May 1991. During the first year of his employment, he worked in the bank's private banking department as a marketing coordinator. While working in the private banking department, Runnebaum experienced difficulty in satisfying his professional responsibilities. His supervisor, Michael Kines, detailed Runnebaum's improper professional and personal conduct in written evaluations dated March 20, 1992, and May 18, 1992. Michael Brown, NationsBank's Senior Managing Officer in Baltimore, and David Kutch, another of Runnebaum's supervisors, also testified that Runnebaum's professional career was plagued by unexplained absenteeism, chronic tardiness, and lengthy lunch periods.

In May 1992, Runnebaum applied for a sales position in NationsBank's new Baltimore trust department. Ann Pettit, the bank's trust department supervisor, hired Runnebaum in June 1992. In completing the paperwork to effectuate the transfer, Runnebaum unequivocally represented that he was not handicapped. Runnebaum's transfer to the new department was effective July 8, 1992. Not surprisingly, Kines and Kutch were relieved to see Runnebaum transferred out of the private banking division.

At the time Runnebaum was transferred to the trust department in Baltimore, Pettit articulated NationsBank's expectations for him in a memorandum dated July 14, 1992 (July Memorandum). The memorandum stated that Runnebaum should arrange with NationsBank sales officers to make "18 joint prospect calls" and "12 joint external referral source calls." Runnebaum does not dispute that he failed to comply with the July Memorandum.

_____

**1** In addition to the briefing we received from the parties, we accepted amicus curiae briefs from the Equal Employment Opportunity Commission and the Whitman-Walker Clinic, Incorporated. We thank Amici for their participation.

3

In addition to failing in his professional duties, Runnebaum continued to engage in inappropriate behavior. In presentations to two law firms whose business NationsBank was courting, Runnebaum presented trust and estate information in a condescending manner to attorneys who were skilled in that area of the law. Additionally, Runnebaum provided to one law firm a trust and estate manual prepared by another law firm. In doing so, he implied that the recipient of the manual would not otherwise comprehend trust and estate law. At yet another meeting with a major client, NationsBank officers were "committed that [Runnebaum] not be there, because they were afraid of what he might say or do." (J.A. at 549.) Brown cautioned Runnebaum regarding his unprofessional conduct. In addition, Pettit felt that Runnebaum's joking was "inappropriate." In fact, Runnebaum admitted in his own sworn testimony that Pettit counseled him twice concerning his unprofessional conduct at meetings.

A homosexual, Runnebaum was diagnosed with HIV in 1988. At all times relevant to this case, he has been asymptomatic. In September 1992, Runnebaum told Brown, also a homosexual, that he was infected with HIV. He revealed that he was HIV-positive to Brown at a gay bar in their capacity as friends. Brown testified:

> Again, I think that it was like a weekend night or something, and [Runnebaum] was down around the harbor with friends or something, and called me and said, come on down and join us or something like that. . . . I ended up coming down, picking [Runnebaum] up standing on the street. . . . [W]e went to a bar, it is on Charles Street, called -- I forget the name. It was a restaurant bar, gay clientele. And my recollection is he just told me.
>
> . . . .
>
> William was sharing with me something that was you know, deep, very personal, known by very few. . . . In fact, his lover, John, didn't even know [he was HIV-positive], he told me. And I can remember just thinking -- I remember being in a state of panic, panic because I was thinking how am I going to work, you know and be a friend to somebody who is HIV[-]positive. . . . But, you know, suppose he dies

4

> on me. Should I tell [Pettit] at this point, should I tell [NationsBank]? I remember feeling panicky, uncontrolled.
>
> But at the same time[,] I remember thinking I cannot let him think that it bothers me a bit. I felt like that I was there to protect him.

(J.A. at 506-08.) Runnebaum asked Brown if the bank's employee health plan would pay for AIDS medication.

On November 3, 1992, Pettit met with Runnebaum to discuss his untoward conduct and his dereliction in meeting sales goals. According to Runnebaum, Pettit "counseled me . . . on my behavior in [staff] meetings," stated "that there was a lot of jocular behavior going on" in the meetings, and "asked me not to participate in it." (J.A. at 91.) According to Pettit, she decided at the meeting that Runnebaum would not be able to complete his assigned activities and should be discharged.

Sometime in November 1992, Runnebaum placed his first order for the prescription drug azidothymidine (AZT), which was paid for by the bank's health plan. AZT is a drug used in the treatment of HIV infection and AIDS. Because Runnebaum could not wait at home to receive shipments of the drug, he had them delivered to the bank. Packages containing AZT (addressed to Runnebaum) were twice inadvertently opened by bank personnel.

Despite her decision to terminate Runnebaum, Pettit decided to give him an opportunity to redeem himself. Accordingly, on November 6, 1992, she gave Runnebaum responsibility for planning and hosting the bank's "Greater Baltimore Holiday Reception," scheduled for December 15th. She also reduced his load of calls on "prospects" (potential clients) and "external referral sources." On December 15, 1992, Runnebaum hosted the bank's holiday reception. He brought his gay lover to the reception and introduced him to Pettit and others as his "boyfriend."

Runnebaum's inability to meet reduced sales goals and his frequent failure to conduct himself professionally confirmed Pettit's decision

5

to discharge him. In a memorandum dated January 7, 1993 (January Memorandum), Pettit observed that Runnebaum failed to comply with the July Memorandum and to comport himself professionally. While many considerations entered the calculus to discharge Runnebaum,**2** Pettit focused on the fact that he had failed to meet his sales goals, despite the fact that his goals had been reduced in the hope that he might be able to satisfy them, as well as failed to perform required duties and exhibit proper decorum.

On January 12, 1993, Pettit summoned Runnebaum to a meeting with Phillip Cawley, NationsBank's personnel manager for the Baltimore/Washington area. At the meeting, Pettit fired Runnebaum. According to Pettit, she fired Runnebaum for failing to complete the assignments listed in the July Memorandum and for failing to present a professional image. Pettit stated in her deposition that she had already decided to fire Runnebaum when she learned in late November or early December that he was infected with HIV. She testified that Runnebaum's condition played no role in her termination decision. Runnebaum said that his firing "came as a total surprise. I had no verbal warnings, no written warnings. I was called in and let go and told I would be paid through the end of the month and it totally blindsided me." (J.A. at 237.)

Runnebaum promptly filed an administrative claim with the Equal Employment Opportunity Commission and received a right-to-sue letter. He then filed suit against NationsBank in the United States District Court for the District of Maryland, bringing two claims. First, he claimed that NationsBank terminated him in violation of the ADA because he is HIV-positive, a condition that he contends renders him disabled.**3** Second, he claimed that his termination violated ERISA by

---

**2** Runnebaum also devoted a great deal of time to advancing his acting career and his own corporation, Wilmarc Productions, while ostensibly working for NationsBank. He also wrote numerous personal letters and invitations on company time and with company equipment.

**3** Runnebaum's complaint may also be read to allege that he is disabled because of his homosexuality. As the district court correctly noted, and as Runnebaum conceded at oral argument, the ADA specifically excludes homosexuality as a disability. See 42 U.S.C.A. § 12211(a) (West 1995).

preventing him from receiving payments for his AZT treatment. After discovery, NationsBank moved for summary judgment. On August 17, 1994, the district court, applying the McDonnell Douglas analytical framework, granted the bank's motion on the ground that Runnebaum failed to establish a prima facie case of discrimination under the ADA. Alternatively, the court held that Runnebaum failed to present evidence, sufficient to create a triable issue, that the legitimate, non-discriminatory reason that NationsBank proffered to explain Runnebaum's discharge was a pretext for discrimination. The court also granted summary judgment for NationsBank on Runnebaum's ERISA claim, stating that it decided the ERISA issue "under the same analytical framework as [the] ADA claim." (J.A. at 572.) Runnebaum now appeals.

## II. THE ADA CLAIM

We review a district court's grant of summary judgment de novo. See Higgins v. E.I. Dupont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is proper only if no material facts are in dispute. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The compulsory language of Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Following NationsBank's motion for summary judgment, Runnebaum bore the burden of producing competent evidence on each element of his claim. See id. at 324. The district court, in granting NationsBank's motion for summary judgment, determined that Runnebaum failed to present evidence sufficient to create a genuine issue with respect to any material fact, and that NationsBank was entitled to judgment as a matter of law.

In determining whether a genuine issue of material fact is in dispute, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Runnebaum, however, "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d

7

213, 214 (4th Cir. 1985) (citing <u>Barwick v. Celotex Corp.</u>, 736 F.2d 946, 963 (4th Cir. 1984)). Indeed, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Anderson</u>, 477 U.S. at 252. Thus, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." <u>Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.</u>, 53 F.3d 55, 62 (4th Cir. 1995).

## A. <u>McDonnell Douglas</u> Framework

The <u>McDonnell Douglas</u> scheme of proof applies to ADA claims like Runnebaum's, "where the defendant disavows any reliance on discriminatory reasons for its adverse employment action." <u>Ennis</u>, 53 F.3d at 57-58; <u>see generally St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502 (1993); <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981); <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). The <u>McDonnell Douglas</u> proof scheme involves a three-step process. First, the plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. By establishing a prima facie case, the plaintiff creates a rebuttable "presumption that the employer unlawfully discriminated against" him, and the burden of producing evidence on the issue shifts to the employer. <u>Burdine</u>, 450 U.S. at 254. The employer then must "rebut the presumption of discrimination by producing evidence that the plaintiff was [terminated] . . . for a legitimate, nondiscriminatory reason." <u>Id.</u> at 254. The employer "`must clearly set forth, through the introduction of admissible evidence,' reasons for its action which, <u>if believed by the trier of fact</u>, would support a finding that unlawful discrimination was not the cause of the employment action." <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 507 (quoting <u>Burdine</u>, 450 U.S. at 254-55 & n.8). Finally, if the employer meets its burden of production, the presumption raised by the prima facie case is rebutted and "drops from the case," <u>Burdine</u>, 450 U.S. at 255 n.10, and the plaintiff bears the ultimate burden of proving that he has been the victim of intentional discrimination, <u>see St. Mary's Honor Ctr.</u>, 509 U.S. at 506-11 (holding that a prima facie case plus disbelief of employer's asserted justification for employment action is not necessarily sufficient to establish a violation and that, in such cases, summary judgment is appropriate unless the plain-

8

tiff presents adequate evidence that the employer unlawfully discriminated).

B. The Prima Facie Case

To establish a prima facie case of discrimination in a discharge case under the ADA, a plaintiff must prove by a preponderance of the evidence that (1) he was a member of the protected class; (2) he was discharged; (3) at the time of the discharge, he was performing his job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. See Ennis, 53 F.3d at 58. Evidence that a plaintiff presents in attempting to establish a prima facie case "must be such that, if the trier of fact finds it credible, and the employer remains silent, the plaintiff would be entitled to judgment as a matter of law." Id. at 59 (citing Burdine, 450 U.S. at 254). It is undisputed that NationsBank discharged Runnebaum. We therefore consider whether Runnebaum established the remaining three elements of a prima facie case of discrimination.

1. Member of the Protected Class

The first element that Runnebaum must satisfy in establishing a prima facie case is that he was a member of the protected class. Runnebaum claims that he is protected by the ADA as "a qualified individual with a disability," 42 U.S.C.A. § 12112(a) (West 1995), because he is HIV-positive. NationsBank contends that Runnebaum, who was asymptomatic at all times relevant to this case, failed to establish that asymptomatic HIV infection is a disability under the statute.[4] The Equal Employment Opportunity Commission (EEOC)

---

[4] The district court assumed, "for the purposes of the [summary judgment] motion, that even an asymptomatic HIV infection may be a disability within the [A]ct." (J.A. at 570.) The dissent contends that "NationsBank conceded Runnebaum's disability in district court," post at 31, and therefore waived its right to argue on appeal that Runnebaum is not disabled under the ADA. The dissent also contends that "Runnebaum has had no opportunity to present facts about disability," post at 31, and that Runnebaum "had no hint that he should have been developing or making a summary judgment record on disability," post at 33. Runnebaum, however, knew that he bore the burden of developing a summary

9

and the Whitman-Walker Clinic, Inc., appearing as amicus curiae, contend that asymptomatic HIV infection is a disability per se under the statute.

_____

judgment record in support of his contention that he was a member of the protected class. In paragraph 24 of his Complaint, Runnebaum alleged that he was "a qualified individual and a person with a disability as defined under the [ADA] due to his HIV-positive status." (J.A. at 6.) In its Answer, NationsBank did not concede this allegation: "NationsBank is without knowledge or information sufficient to form a belief as to the truthfulness of the allegations in paragraph 24, but states that plaintiff did not perform competently the essential functions of the position which he held at the time of this termination." (J.A. at 15.) Thus, Runnebaum knew (or should have known) that NationsBank was not conceding that he was a member of the protected class and that he therefore needed to develop facts establishing that he was a member of the protected class, i.e., that he had a statutory disability. Hence, addressing the "protected class" prong of the prima facie case in no way prejudices Runnebaum as the dissent contends.

Furthermore, Runnebaum had ample opportunity to present facts about his alleged disability. NationsBank filed its Answer in this case on December 8, 1993, after which a lengthy discovery period ensued. Indeed, NationsBank did not file its motion for summary judgment until June 27, 1994, over six months later. The discovery materials forming the record in this case are voluminous, and include numerous documents concerning Runnebaum's firing and, importantly, lengthy depositions of Runnebaum and Dr. Michael Pistole, Runnebaum's own medical expert. As discussed more extensively below, the facts developed by Runnebaum over the course of this lengthy discovery period unequivocally show that he was not impaired during the relevant time period. Any additional evidence developed by Runnebaum showing that he actually suffered diminishing effects from his HIV infection would necessarily contradict his own sworn testimony and the sworn testimony of his doctor. Cf. Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975-76 (4th Cir. 1990) (disregarding affidavit of witness that contradicted witness's own prior sworn deposition testimony); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) (same). With respect to perceived disability, the record could not be developed further: Pettit, the relevant decisionmaker with respect to Runnebaum, was deposed; numerous other bank employees were deposed; and the documents pertaining to Runnebaum's firing were discovered. There simply are no more facts to be developed, and Runnebaum makes no argument that there are.

In addition, NationsBank has never conceded that Runnebaum's HIV infection constitutes a disability under the ADA. In its Memorandum in

The ADA describes three subsets of disability, any one of which is sufficient to trigger the statute's protections. The ADA states:

_____

Support of Summary Judgment and its Reply Memorandum in Support of Summary Judgment, NationsBank assumed that Runnebaum was a member of the class protected by the ADA because of his HIV infection. Viewing the summary judgment record as a whole, however, reveals that NationsBank's statements in this regard have more to do with summary judgment strategy than with an express concession of a necessary element on which Runnebaum bore the burden of production. In its Memorandum in Support of Summary Judgment (the same document in which the dissent contends NationsBank conceded that Runnebaum is a member of the protected class), NationsBank stated:

> At no time during plaintiff's employment by NationsBank did [Runnebaum] request an accommodation pursuant to the Americans with Disabilities Act. At no time during his employment with NationsBank did [Runnebaum] request a job change for disability reasons. To the contrary, he stated he was not disabled. Moreover, since 1988 [Runnebaum] has been asymptomatic with respect to his HIV-positive condition. In fact,[Runnebaum's] own medical expert, Dr. Michael Pistole, stated that[Runnebaum] is in better health today with respect to the HIV virus than when he first sought treatment in 1988.

(J.A. at 42-43 (citations to summary judgment exhibits omitted).) As the Memorandum itself reveals, NationsBank did not concede that Runnebaum's HIV infection constitutes a statutory disability.

In any event, we are not bound by either NationsBank's summary judgment strategy or the district court's assumption that asymptomatic HIV infection is a disability. See Shafer v. Preston Mem'l Hosp., 107 F.3d 274, 275 n.1 (4th Cir. 1997) ("We have consistently recognized that we may affirm a district court's decision on different grounds than those employed by the district court."); Jackson v. Kimel, 992 F.2d 1318, 1322 (4th Cir. 1993) (same). Indeed, "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." Singleton v. Wulff, 428 U.S. 106, 121 (1976). On the facts of this case, it is evident that given additional opportunity, Runnebaum could not develop the record further on the issue of whether he actually has, or was perceived as having, an impairment that substantially limits one or more of the major life activities. Whether asymptomatic HIV infection is a disability under the statute is primarily a question of law, the facts pertaining to this issue are sufficiently developed, and the issue was briefed and argued on appeal. Accordingly, we consider whether Runnebaum's HIV infection constitutes a disability under the statute.

11

The term "disability" means, with respect to an individual
--

 (A) a physical or mental impairment that substantially
limits one or more of the major life activities of such indi-
vidual;

 (B) a record of such an impairment; or

 (C) being regarded as having such an impairment.

42 U.S.C.A. § 12102(2) (West 1995). In Ennis, 53 F.3d at 55, we
stated that "[t]he term `disability' is specifically defined, for each of
subparts (A), (B), and (C), `with respect to[the] individual,'" 53 F.3d
at 59 (second alteration in original), and held that the statute's "indi-
vidualized focus" contemplates a case-by-case determination of
whether a given impairment substantially limits one or more of the
major life activities of the individual, see id. We reaffirm our holding
in Ennis; accordingly, a finding that Runnebaum has a disability
under this provision must be made on an individualized basis.**5** See id.
at 59-60 (collecting cases holding that a finding of disability must be
made on a case-by-case basis); see also Homeyer v. Stanley Tulchin
Assocs., Inc., 91 F.3d 959, 962 (7th Cir. 1996) (holding that "a deter-
mination of disability must be made on an individualized, case-by-
case basis"); Katz v. City Metal Co., 87 F.3d 26, 32 (1st Cir. 1996)
(same). Neither Runnebaum nor Amici claim that Runnebaum was
fired based on a record of disability, see 42 U.S.C.A. § 12102(2)(B),
so we focus on the first and third statutory definitions.

The dissent complains at length -- despite our careful adherence

_____

**5** Although a finding of disability under the statute must be made on a
case-by-case basis, see Ennis v. National Ass'n of Bus. & Educ. Radio,
Inc., 53 F.3d 55, 59 (4th Cir. 1995), we recognize that some conditions
will always constitute impairments that substantially limit the major life
activities of the afflicted individual. For instance, blindness and deafness
are physical conditions that always substantially limit the major life
activities of blind and deaf individuals. In such cases, an individualized
determination of whether the condition is an impairment that substan-
tially limits one or more of the major life activities is unnecessary.

12

to the statutory language and the particular facts of this case -- that our holding today effects an amendment § 12102(2) of the ADA. See post at 48. The dissent, however, is hard pressed to find fault with our interpretation of the statutory language. With respect to our analysis of the first statutory definition, the "actual disability" prong of the statute, the dissent "accept[s] the dictionary definitions of `impair' and `impairment' adopted by the majority," post at 37; admits that "[t]he question of whether procreation and intimate sexual relations are `major life activities' under the ADA is . . . `not free from doubt,'" post at 44 (quoting Abbott v. Bragdon, 107 F.3d 934, 939 (1st Cir. 1997)); acknowledges that the administrative regulations it relies on are "less decisive," post at 45; and concedes that our holding that asymptomatic HIV itself does not substantially limit procreation or intimate sexual relations has "intuitive plausibility," post at 45. With respect to our analysis of the second statutory definition, the "perceived disability" prong, the dissent correctly recognizes that "[t]here is not a great deal of direct evidence that the bank regarded Runnebaum as disabled," post at 49; and confesses, as it must, that "`the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action,'" post at 53 (quoting Kelly v. Drexel Univ., 94 F.3d 102, 109 (3rd Cir. 1996)). After making these numerous and important concessions regarding our interpretive analysis, the dissent is left to discuss isolated passages in the legislative history and obscure references in the administrative regulations as support of its position that asymptomatic HIV infection is an impairment that substantially limits one of the major life activities contemplated by the ADA. As we discuss below, neither the legislative history nor the administrative regulations persuade us that Runnebaum's HIV infection constitutes a statutory disability.

The dissent also complains that we employ "a dizzying flurry of alternate holdings" in concluding that Runnebaum's asymptomatic HIV infection does not constitute a statutory disability. See post at 48. We certainly do. Runnebaum's inability to prevail on many grounds (indeed on any ground), however, in no way "betray[s] an uncertainty" on our part as the dissent suggests, see post at 48, but instead only reinforces our conclusion that Runnebaum's HIV infection is not an impairment that substantially limits one of the major life activities.

13

Finally, the dissent states: "I believe the majority means to create a per se rule excluding those with asymptomatic HIV from the protections of the ADA." Post at 31; see also post at 48 ("The majority's opinion must be taken for what it is: a per se rule that excludes those with asymptomatic HIV from the protections of the ADA."). The dissent would, perhaps, have us hold that asymptomatic HIV infection is per se not a disability under the statute. As we discuss below, however, we decline to go so far.

a. Section 12102(2)(A) -- Actual Disability

Subsection (A) defines "disability" to be "a physical or mental impairment that substantially limits one or more of the major life activities" of the individual in question. Because the impairment must impose a "substantial limitation" on "one or more of the major life activities," the impairment must be significant, not merely trivial. See Byrne v. Board of Educ., 979 F.2d 560, 564 (7th Cir. 1992); see also Forrisi v. Bowen, 794 F.2d 931, 933-34 (4th Cir. 1986) (concluding in Rehabilitation Act case that "[t]he statutory language, requiring a substantial limitation of a major life activity, emphasizes that the impairment must be a significant one"). To qualify as having a disability under subsection (A), Runnebaum must prove two things: first, that asymptomatic HIV infection is a "physical or mental impairment"; and second, that asymptomatic HIV infection, if an impairment, "substantially limits one or more of the major life activities" of Runnebaum. See Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 722 (2nd Cir. 1994); see also Abbott, 107 F.3d at 939; Andrews v. Ohio, 104 F.3d 803, 808 (6th Cir. 1997).

i. Impairment

First, Runnebaum must prove that asymptomatic HIV infection is a "physical or mental impairment." 42 U.S.C.A. § 12102(2)(A). The Supreme Court has yet to decide this issue. See School Bd. of Nassau County v. Arline, 480 U.S. 273, 282 n.7 (1987) (declining to decide in Rehabilitation Act case whether an asymptomatic HIV-infected person "could be considered to have a physical impairment"). Whether asymptomatic HIV infection is an impairment under the ADA is first and foremost a question of statutory interpretation. "When confronted with a question of statutory interpretation, our

14

inquiry begins with an examination of the language used in the statute." Faircloth v. Lundy Packing Co., 91 F.3d 648, 653 (4th Cir. 1996), cert. denied, 117 S. Ct. 738 (1997). In cases where "the statutory language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and . . . the sole function of the courts is to enforce [the statute] according to its terms." United States v. Murphy, 35 F.3d 143, 145 (4th Cir. 1994) (quotations omitted). In addition, "[w]hen a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." Smith v. United States, 508 U.S. 223, 228 (1993).

Here, the term "impairment" is not defined in the statute. Webster's defines "impair" as to "make worse by or as if by diminishing in some material respect." Webster's Ninth New Collegiate Dictionary 603 (1986); see also Black's Law Dictionary 677 (5th ed. 1981) ("To weaken, to make worse, to lessen in power, diminish, or relax, or otherwise affect in an injurious manner."). "Impairment" is defined as a "decrease in strength, value, amount, or quality." Webster's II New Riverside University Dictionary 612 (1988); see also Webster's Third New International Dictionary 1131 (1986) (defining impairment as "deterioration" or "lessening"). Under these definitions, asymptomatic HIV infection is simply not an impairment: without symptoms, there are no diminishing effects on the individual. "[T]he term `impairment,' as it is used in the Act, cannot be divorced from its dictionary and common sense connotation of a diminution in quality, value, excellence or strength." de la Torres v. Bolger, 781 F.2d 1134, 1138 (5th Cir. 1986) (quotation omitted). Many conditions, including HIV infection, are asymptomatic in their initial stages and remain so for an extended period of time. See Chalk v. United States Dist. Court, 840 F.2d 701, 706 (9th Cir. 1988) ("Individuals who become infected with HIV may remain without symptoms for an extended period of time."); Cain v. Hyatt, 734 F. Supp. 671, 679 (E.D. Pa. 1990) ("There is a time lapse, often of several years, between exposure to HIV and the onset of symptoms."). Extending the coverage of the ADA to asymptomatic conditions like Runnebaum's, where no diminishing effects are exhibited, would run counter to Congress's intention as expressed in the plain statutory language.**6**

_____

**6** The dissent concedes that the statutory term "impairment" requires diminishing effects on the individual, but then contends that asymptom-

15

Amici contend, despite the plain meaning of "impairment," that asymptomatic HIV infection is always a physical impairment. This proposition has some decisional support. See Abbott, 107 F.3d at 939 (concluding that asymptomatic HIV infection is an impairment under the ADA); Gates v. Rowland, 39 F.3d 1439, 1446 (9th Cir. 1994) (same). Specifically, Amici argue that the legislative history of the ADA establishes that Congress intended that asymptomatic HIV infection be considered an impairment. The Committee Reports cited by Amici, each employing identical language, state that the term "mental or physical impairments" includes

> such conditions, diseases and infections as: orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, infection with the Human Immunodeficiency Virus, cancer, heart disease, diabetes, mental retardation, emotional illness, specific learning disabilities, drug addiction, and alcoholism.

H.R. Rep. No. 101-485(II), at 51, reprinted in 1990 U.S.C.C.A.N. 303, 333; accord H.R. Rep. No. 101-485(III), at 28, reprinted in 1990 U.S.C.C.A.N. 445, 451; S. Rep. No. 101-116, at 22, reprinted in

---

atic HIV infection produces such diminishing effects. See post at 37-40. As support for this contention, the dissent cites and quotes popular and scientific literature stating that HIV and the body's immune system engage in "mortal combat," that HIV "attacks" the body's immune system, and that the body's immune system "counterattack[s]" the virus. Post at 37-38. Battlefield allusions aside, we are not convinced that "diminishing effects" can be analyzed at so low a level of generality. See Smith v. United States, 508 U.S. 223, 228 (1993) (statutory language must be construed in accordance with its ordinary or natural meaning). Advancements in genetic research, for example, have given doctors and scientists the increasing ability to identify seemingly healthy individuals who will develop various serious diseases. What these doctors and scientists have discovered is that serious diseases -- like ovarian and breast cancer, Alzheimer's, and Muscular Dystrophy -- lurk in the genes, and perhaps the futures, of millions of apparently healthy people. Under the dissent's logic, such otherwise healthy individuals would be impaired for purposes of the ADA. See post at 39 (asserting that "the body is impaired as soon as the disease enters it"). The term "impairment," however, does not extend so far.

16

Arnold & Porter Legislative History of P.L. 101-336 (1994), available in WESTLAW, Americans with Disabilities Act of 1990-Legislative History (ADA-LH) database. As we have stated, however, the statutory meaning of "impairment" is plain and unambiguous. Accordingly, we have no reason to resort to the legislative history to ascertain Congress's intent. See Garcia v. United States, 469 U.S. 70, 75 (1984); Murphy, 35 F.3d at 145.

Moreover, the isolated references to HIV infection in the Committee Reports do not distinguish between symptomatic and asymptomatic conditions as the plain meaning of "impairment" requires. As a result, the Committee Reports, by their own terms, do not answer whether asymptomatic HIV infection is an impairment under the statute. We decline to conclude, based on the above-cited isolated statements in the legislative history, that Congress intended for the term "impairment" to include conditions that do not cause diminishing effects on the individual. Accordingly, we reject Amici's argument that the legislative history broadens the plain statutory language. See Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 501 (1988) (stating that "unenacted approvals, beliefs, and desires are not laws"); cf. Pittston Coal Group v. Sebben, 488 U.S. 105, 115 (1988) (rejecting argument that legislative history at issue limited general statutory language).[7]

---

[7] Like Amici, the dissent relies heavily on what it characterizes as the "wealth of legislative history," post at 31, supporting its proposition that asymptomatic HIV infection is an impairment that substantially limits one of the major life activities contemplated by the ADA. Specifically, in addition to citing the Committee Reports (which we find unhelpful), the dissent cites and quotes floor statements made by Senator Kennedy, and Representatives McDermott, Owens, and Waxman. See post at 41. The dissent refers to these floor statements to demonstrate what it describes as "the breadth of the congressional presumption that individuals with HIV would be covered." Post at 41. Even if we believed that the collective intent of a 535-member body is ascertainable by reference to legislative history (which we doubt), we find it unfathomable that the statements of one Senator and three Congressmen could serve as the expression of that collective intent. We choose instead to adhere to "the strong presumption that Congress expresses its intent through the language it chooses." INS v. Cardoza-Fonseca, 480 U.S. 421, 432 n.12 (1987).

17

The plain meaning of "impairment" suggests that asymptomatic HIV infection will never qualify as an impairment: by definition, asymptomatic HIV infection exhibits no diminishing effects on the individual. Nevertheless, the ADA's "of such individual" language requires that courts determine on an individualized, case-by-case basis whether an individual's asymptomatic HIV infection is a statutory disability. See Ennis, 53 F.3d at 59-60. In Ennis, for example, we considered whether a child's asymptomatic HIV infection constituted a "disability" under the statute. We stated:

> There is no evidence in the record before us that[the child] is impaired, to any degree, or that he currently endures any limitation, much less a substantial limitation, on any major life activity. His mother has candidly admitted that her son suffers no ailments or conditions that affect the manner in which he lives on a daily basis.

Id. at 60. Here, we could say much the same about Runnebaum. Runnebaum produced no evidence showing that he was impaired, to any degree, during the relevant time period. Runnebaum does not assert that he suffers an actual physical or mental impairment because of his HIV infection, nor could he credibly do so. He has been asymptomatic since being diagnosed in 1988 and, during the relevant time, suffered no diminishing effects from his HIV infection.

In completing the paperwork to effectuate his transfer from private banking to the trust department, Runnebaum unequivocally represented that he was not handicapped, signifying his own belief that he suffered no disability. Furthermore, he never once requested that NationsBank implement accommodations regarding any disability pursuant to the ADA. In fact, Runnebaum's own physician, Dr. Michael Pistole, testified that Runnebaum "had no ill effects from the disease or the medications." (J.A. at 154-55 (emphasis added).) Comporting with Dr. Pistole's testimony, Runnebaum has consistently maintained that he endures no impairment. In light of the plain statutory language and the facts of this case, we hold that Runnebaum's HIV infection, because it is asymptomatic, is not a "physical or mental impairment" under § 12102(2)(A) of the ADA. Accordingly, Runnebaum's asymptomatic HIV infection is not a disability under the statute.

18

ii. Substantial Limitation on the Major Life Activities

Second, even if asymptomatic HIV infection were an impairment, Runnebaum must prove that asymptomatic HIV infection substantially limits one or more of the major life activities. See 42 U.S.C.A. § 12102(2)(A). The term "major life activity" is not defined in the statute. See Kelly, 94 F.3d at 105 (citing Bolton v. Scrivner, Inc., 36 F.3d 939, 942 (10th Cir. 1994)). We therefore must construe it in accordance with its ordinary or natural meaning. See Smith v. United States, 508 U.S. 223, 228 (1993).

Webster's defines "major" as "[d]emanding great attention or concern," Webster's II New Riverside University Dictionary 718 (1988); and, as "greater in dignity, rank, importance, or interest," Webster's Third New International Dictionary 1363 (1986). These definitions suggest that an activity qualifies under the statutory definition as one of the major life activities contemplated by the ADA if it is relatively more significant or important than other life activities. Conversely, the definitions suggest that a life activity that is relatively less significant than other life activities does not qualify as one of the ADA's major life activities, and therefore does not trigger the statute's definition of disability, regardless of the magnitude of the limitation caused by the given impairment.

Although a determination of disability under the statute calls for an individualized inquiry into whether the plaintiff is disabled, see Ennis, 53 F.3d at 59-60, the statutory language -- with its reference to "the major life activities" -- implies that a corresponding case-by-case inquiry into the connection between the plaintiff and the major life activity is not necessary. For example, working is one of the major life activities of the ADA, see Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346, 349 (4th Cir. 1996), cert. denied, 117 S. Ct. 1844 (1997), even though working may not be of particular "significance" or "importance" to a given plaintiff. Thus, courts need only consider whether the impairment at issue substantially limits the plaintiff's ability to perform one of the major life activities contemplated by the ADA, not whether the particular activity that is substantially limited is important to him. Cf. Abbott, 107 F.3d at 941 (suggesting that whether a particular activity is one of the major life activities under the statute is not a subjective inquiry).

19

Amici cite procreation and intimate sexual relations as the major life activities that are substantially limited by Runnebaum's asymptomatic HIV infection. They do not explain why the activity of engaging in intimate sexual relations is one of the major life activities contemplated by the statute, but contend that "procreation is properly viewed as a `major life activity,' since it is `one of the most fundamental of human activities.'" (EEOC Br. at 17 (quotation omitted); accord Whitman-Walker Br. at 19-20.) We agree that procreation is a fundamental human activity, but are not certain that it is one of the major life activities contemplated by the ADA.**8** Compare Krauel v. Iowa Methodist Med. Ctr., 95 F.3d 674, 677 (8th Cir. 1996) (holding that procreation is not one of the major life activities under the ADA); Zatarain v. WDSU-Television, Inc., 79 F.3d 1143 (5th Cir. 1996) (unpublished), aff'g 881 F. Supp. 240, 243 (E.D. La. 1995) (same), with Abbott, 107 F.3d at 941 (concluding that although "the question is very close," procreation is a major life activity); McWright v. Alexander, 982 F.2d 222, 226-27 (7th Cir. 1992) (assuming without deciding that reproduction is one of the major life activities under the Rehabilitation Act). Furthermore, we are not convinced that engaging in intimate sexual relations falls within the statutory rubric of the major life activities.

Assuming, however, that procreation and intimate sexual relations are major life activities protected by the ADA, Runnebaum must still prove that asymptomatic HIV infection substantially limits his ability to procreate or engage in intimate sexual relations. See 42 U.S.C.A. § 12102(2)(A). Amici contend that Runnebaum's HIV infection, "even if asymptomatic, substantially limits . . . procreation and intimate sexual relations . . . because of concerns that the offspring or

_____

**8** Amici argue that the "fact that reproduction is recognized as a fundamental right under the Constitution also supports the view that it is a `major' life activity." (EEOC Br. at 19; accord Whitman-Walker Br. at 21 n.5.) The constitutionally-protected status of an activity, however, has little, if any, bearing on whether or not an activity is one of the major life activities contemplated by the ADA. Neither gathering in a group nor carrying a firearm are one of the major life activities under the ADA, though individuals have the constitutional right to peaceably assemble, see U.S. Const. amend. I; and to "keep and bear Arms," U.S. Const. amend. II.

20

partner will be infected with the virus." (EEOC Br. at 10; accord Whitman-Walker Br. at 19-21.) As support for this proposition, Amici cite to a memorandum prepared by the Justice Department's Office of Legal Counsel. Issued September 27, 1988, the memorandum discusses the application of identical provisions of the Rehabilitation Act to asymptomatic HIV-infected individuals. See Memorandum from Douglas W. Kmiec, Acting Assistant Attorney General, Office of Legal Counsel, to Arthur B. Culvahouse, Jr., Counsel to the President (Sept. 27, 1988), reprinted in 8 Fair Empl. Prac. Manual (BNA) No. 641 at 405:4-7 [hereinafter Kmiec Memorandum]. The memorandum, however, is more limited than Amici claim. Rather than definitively interpreting the statute, it attempts to predict how courts will resolve the question of whether asymptomatic HIV infection substantially limits one or more of the major life activities, and speculates that "at least some courts would find" that asymptomatic HIV infection substantially limits "procreation and intimate personal relations." (Kmiec Memorandum at 405:6.)

Specifically, the memorandum suggests that some courts will find that asymptomatic HIV infection substantially limits procreation because asymptomatic HIV-infected individuals will forego having children because of "the fear of what the infection will do to one's child." (Kmiec Memorandum at 405:7.) The memorandum also predicts that "some courts can be expected to find a limitation of a major life activity in the fact that an asymptomatic HIV-infected individual's intimate relations are also likely to be affected by HIV infection." Id. In sum, the memorandum posits that some courts will find that asymptomatic HIV infection substantially limits procreation and intimate sexual relations because asymptomatic HIV-infected individuals will choose to forego having children and engaging in intimate relationships because of their contagiousness.

The memorandum equivocates, however, recognizing that finding a limitation of life activities based on the asymptomatic individual's response to his knowledge of his infection is "not fully persuasive since it depends upon the conscience and good sense of the person infected." Id. The ADA's statutory language requires that the impairment substantially limit one or more of the major life activities. See 42 U.S.C.A. § 12102(2)(A). In the case of asymptomatic HIV infection, however, the memorandum acknowledges that it is "the

21

conscience or normative judgment of the particular infected person," not the impairment, that substantially limits procreation and intimate sexual relations. (Kmiec Memorandum at 405:7 (emphasis added).) As the memorandum confesses, "there is nothing inherent in the infection which actually prevents either procreation or intimate relations." Id.

Although conceding that asymptomatic HIV infection does not prevent either procreation or intimate relations, the memorandum nevertheless postulates that "in any case where the evidence indicates that the plaintiff HIV-infected individual has in fact changed his or her behavior -- as, for example, where the plaintiff represents that procreation has been foregone -- the court might well find a limitation of major life activity." Id. Thus, the memorandum qualifies its prediction that at least some courts will find asymptomatic HIV infection substantially limits procreation or intimate sexual relations, and bases its prediction on the notion that a person's reaction to his impairment may serve to create a statutory disability. "Moreover," the memorandum suggests, "courts may choose to pass over such factual questions . . . [and find] a life activity limitation based on the reaction of others to the infection." Id. The memorandum therefore bases its prediction that some courts will find that asymptomatic HIV infection is an actual disability on both the actual disability and perceived disability prongs of the statutory definition. (Kmiec Memorandum at 405:6.)

We hold that asymptomatic HIV does not substantially limit procreation or intimate sexual relations for purposes of the ADA. As the Kmiec Memorandum recognizes, nothing inherent in the infection actually prevents either procreation or intimate relations. Asymptomatic HIV-infected individuals are able to, and indeed do, procreate and engage in sexual intimacies. We recognize that as a behavioral matter, asymptomatic HIV-infected individuals may refrain from having children or engaging in sexual relations "because of concerns that the offspring or partner will be infected with the virus." (EEOC Br. at 10; accord Whitman-Walker Br. at 19-21.) But as a physical matter, nothing inherent in the virus substantially limits procreation or intimate sexual relations. The statutory language is plain: the impairment in question, not the individual's reaction to the impairment, must "substantially limit[ ] one or more of the major life activities of such individual." 42 U.S.C.A. § 12102(2)(A). This language

22

requires a causal nexus between the physical effect of the impairment and one of the major life activities. For example, a paralyzed individual's paralysis is what substantially limits his ability to walk, and a deaf person's deafness is what substantially limits his ability to hear. In the case of asymptomatic HIV infection, however, an individual's reaction to the knowledge of his infection -- not the infection itself -- is what, if anything, substantially limits procreation and intimate sexual relations. Thus, under the statutory definition, asymptomatic HIV infection is not a disability.

Even if the statute permitted a finding that asymptomatic HIV infection substantially limits procreation and intimate sexual relations because of a person's response to the knowledge of his infection, there is no evidence in the record that Runnebaum, because of his infection, forewent having children or engaging in intimate sexual relations. Nothing in the record indicates that Runnebaum refrained from having children out of fear that he would pass the virus on to his child. Indeed, nothing in the record so much as suggests that Runnebaum was at all interested in fathering a child. Moreover, the record makes clear that Runnebaum's ability to engage in intimate sexual relations was not substantially limited by his HIV infection; the record shows that he concealed his HIV infection from his lover. Ergo, Runnebaum's HIV infection, if an impairment, does not substantially limit one or more of the major life activities under § 12102(2)(A).

b. Section 12102(2)(C) -- Perceived Disability

Subsection (C) states that the term "disability" means "being regarded as having such an impairment." 42 U.S.C.A. § 12102(2)(C). The "such an impairment" language incorporates by reference subsection (A)'s description of the sort of impairment that qualifies as a disability: "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C.A. § 12102(2)(A). Thus, the ADA protects from employment discrimination individuals who are regarded or perceived, albeit erroneously, as having an impairment that substantially limits one or more of the major life activities, just as it protects persons who actually have an impairment that substantially limits one or more of the major life activities. Contrary to Amici, who primarily contend that HIV infec-

23

tion is actually an impairment that substantially limits one or more of the major life activities, Runnebaum primarily contends that Nations-Bank fired him because it regarded him as having an impairment that substantially limits one or more of the major life activities. Our analysis of this claim focuses on the reactions and perceptions of the relevant decisionmakers working with Runnebaum. See Ennis, 53 F.3d at 60-61 (discussing evidence to support claim that "relevant decisionmakers" knew of an employee's son's asymptomatic HIV infection); see also Henson v. Liggett Group, Inc., 61 F.3d 270, 276 (4th Cir. 1995) (holding that in discrimination context, perceptions of non-decisionmakers are of low probative value); Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980) ("It is the perception of the decision maker which is relevant."); cf. Kelly, 94 F.3d at 109 (focusing on "the reactions and perceptions of the persons interacting or working with" the plaintiff).

In support of this claim, Runnebaum contends that NationsBank regarded him as having an impairment that substantially limits one or more of the major life activities, even though his asymptomatic HIV infection did not actually do so, because the bank was aware of his asymptomatic HIV infection. In School Bd. of Nassau County v. Arline, 480 U.S. 273 (1987), the Supreme Court interpreted the identical language of the Rehabilitation Act and held that although an individual may not have an impairment that substantially limits one or more of the major life activities of that individual, the negative reactions of others "could nevertheless substantially limit that person's ability to work." Id. at 283. The Court stated that by including "regarded as" in the statutory definition, "Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." Id. at 284.

We reject Runnebaum's argument that he was fired because the relevant decisionmakers at NationsBank held a perception of HIV infection based on "accumulated myths and fears." The evidence produced by Runnebaum revealed (1) that packages sent to the bank (addressed to Runnebaum) containing AZT were twice inadvertently opened by bank personnel; (2) that Brown, a bank supervisor and friend and confidant of Runnebaum's, felt "panicky" and "uncontrolled" at the time he learned of Runnebaum's HIV infection; and (3) that Pettit fired

24

him. None of this evidence, however, is sufficient to create a genuine issue of material fact concerning the perception of Runnebaum's HIV infection held by the relevant decisionmakers at NationsBank.**9**

First, the unknown employees who inadvertently opened the packages containing Runnebaum's AZT medication were not relevant decisionmakers. Furthermore, nothing in the record establishes that the employees who accidentally opened the packages regarded Runnebaum as having an impairment that substantially limited one or more of the major life activities. In addition, the packages were opened well after Pettit had decided to fire Runnebaum; indeed, one of the packages was accidentally opened after Runnebaum had already been fired. In sum, there is no permissible inference that can be drawn from this evidence.

Second, Brown's testimony that he felt "panicky" and "uncontrolled" at the time Runnebaum confided in him is simply insufficient

_____

**9** The dissent claims that this "evidence is bolstered by a variety of circumstantial evidence," including "evidence that the reasons given for Runnebaum's firing were pretextual." Post at 50. Specifically, the dissent points to ostensibly comparative evidence showing that another employee in the same sales position as Runnebaum, Clifford Andersson, was not disabled and remained employed, despite his similarly inferior sales performance. See post at 51-52, 54. However,

> [t]he pitfalls of divining any valid inferences from a comparison between Runnebaum and Andersson are manifold. As an initial matter, Runnebaum was not terminated underline exclusively because he failed to meet sales goals; he was also terminated for absenteeism, tardiness, and improper conduct, and there is no evidence that Andersson exhibited similar shortcomings. Comparing Andersson and Runnebaum, therefore, is improper. . . . In addition, Andersson worked in Washington, D.C., while Runnebaum worked in Baltimore, and there is no evidence that these two markets are similar.

Runnebaum v. NationsBank of Maryland, 95 F.3d 1285, 1307 (4th Cir. 1996) (Williams, J., dissenting) (citations omitted). Thus, evidence that Andersson remained employed despite inadequate sales performance does not support a conclusion that NationsBank's reasons for firing Runnebaum were pretextual, nor does it "bolster" the dissent's contention that NationsBank regarded Runnebaum as disabled.

25

to create a genuine issue of material fact. Although Brown was a bank supervisor, there is no proof that his "panicky," "uncontrolled" feeling meant that he (or the bank) regarded Runnebaum's asymptomatic HIV infection as an impairment that substantially limited one of the major life activities. Even assuming Brown was a relevant decision-maker with respect to Runnebaum, the mere fact that an employer is aware of an employee's asymptomatic HIV infection "is insufficient to demonstrate either that the employer regarded the employee as disabled [i.e., as having an impairment that substantially limits one or more of the major life activities of such individual] or that that perception caused the adverse employment action." Kelly, 94 F.3d at 109; accord Chandler v. Dallas, 2 F.3d 1385, 1393 (5th Cir. 1993) (holding that even employer's belief that plaintiff could not perform a particular task safely does not establish that employer regarded plaintiff as having an impairment that substantially limits one or more of the major life activities). Here, the record establishes that Nations-Bank did not consider HIV-positive employees to have an impairment that substantially limits one or more of the major life activities. To the contrary, the record reveals, and Runnebaum does not dispute, that NationsBank employs several individuals it knows to be infected with HIV.

Third, and most important, there is no indication that Pettit, the relevant decisionmaker with respect to Runnebaum's termination, regarded Runnebaum as having an impairment that substantially limited one or more of the major life activities. Although Pettit knew that Runnebaum was HIV-positive when she discharged him, she did not possess this knowledge when she decided to fire him on November 3, 1992. In her deposition, she testified that she learned in late November or early December that Runnebaum was infected with HIV, but by then she had already decided to fire him. Furthermore, she testified that Runnebaum's asymptomatic HIV infection played no role in her decision to fire him. Pettit's testimony on this point was corroborated by Brown, who stated that he did not disclose to her that Runnebaum was HIV-positive until after Pettit informed Brown that she planned to discharge Runnebaum. Even assuming Pettit learned by some other means about Runnebaum's HIV infection prior to making the decision to fire him, nothing in the record suggests that she regarded asymptomatic HIV infection to be an impairment that substantially limited one or more of the major life activities of Runnebaum.

26

Quite simply, Runnebaum did not hold himself out to NationsBank as having an impairment that substantially limited one or more of the major life activities, NationsBank did not regard or perceive Runnebaum as having such an impairment, and the record does not contain evidence demonstrating otherwise. Cf. Rogers v. Int'l Marine Terminals, Inc., 87 F.3d 755, 757, 760 (5th Cir. 1996) (affirming summary judgment because the record was devoid of evidence showing that employer regarded employee as having an impairment that substantially limited one or more of the major life activities). Runnebaum's HIV infection therefore is not a disability under § 12102(2)(C). Because Runnebaum failed to show that he is disabled under the ADA, he failed to establish the first element of the prima facie case.

2. Legitimate Expectations of Employer

Next, to make out the third element of the prima facie case,[10] Runnebaum must prove that he was meeting NationsBank's legitimate expectations at the time of his discharge. The record is replete with indications that Runnebaum did not meet NationsBank's legitimate expectations for his employment. He failed to submit required reports, to attend certain functions, and to take training classes or attend manager's meetings, as set forth in the July Memorandum. His continuing utter failure to attend to his assigned duties establishes that he was not meeting NationsBank's expectations for his performance. See Ennis, 53 F.3d at 61-62 (concluding that an ADA plaintiff could not prove that she satisfied her employer's legitimate expectations because her work was substandard); Ang v. Procter & Gamble Co., 932 F.2d 540, 548-49 (6th Cir. 1991) (ruling that failure to perform reasonable tasks at an employer's demand constitutes not satisfying legitimate employment expectations); Kephart v. Institute of Gas Tech., 630 F.2d 1217, 1223 (7th Cir. 1980) (per curiam) (holding that if an employee is not doing as he is told to do, then he is not performing his job).

Moreover, during his tenure at NationsBank Runnebaum engaged in a pattern of unprofessional behavior. His conduct frequently veered from the merely unprofessional to the inappropriate and offensive. His penchant for racial and sexual slurs and his improper conduct at

_____

[10] The parties do not dispute that Runnebaum was discharged from his employment, the second element of the prima facie case.

27

business meetings and toward NationsBank clients cannot be considered to fall within the scope of NationsBank's legitimate expectations for his employment.[11] Accordingly, we conclude that Runnebaum failed to establish the third element of the prima facie case.

### 3. Reasonable Inference of Unlawful Discrimination

The fourth element that Runnebaum must satisfy to establish a prima facie case is that his termination transpired under circumstances that raise a reasonable inference of unlawful discrimination. For many of the same reasons that Runnebaum failed to establish the first and third elements, we conclude that he failed to establish the fourth element. Runnebaum was discharged for incompetent performance, lack of performance, and unprofessional conduct. The undisputed facts establish these reasons for his discharge, and Runnebaum attempts to ascribe discrimination to NationsBank's conduct. Given his short employment tenure at NationsBank, the troubles he encountered from the outset, his deficient performance, and his inappropriate conduct, no rational trier of fact could conclude that his termination raised a reasonable inference of unlawful discrimination. See Ennis, 53 F.3d at 62 (holding that because evidence of plaintiff's deficient performance was so pervasive, no rational trier of fact could conclude that her discharge occurred under circumstances giving rise to an inference of discrimination). We therefore conclude that Runnebaum failed to establish the fourth element of a prima facie case.

* * *

Runnebaum thus failed to establish three of the four elements of a prima facie case of discrimination under the ADA. He failed to show that he had a disability and that he therefore was a member of the class of persons protected by the ADA; he failed to show that at the time he was fired he was meeting NationsBank's legitimate expecta-

_____

[11] The facts surrounding Runnebaum's failure to establish the third element of the prima facie case, that he was meeting NationsBank's legitimate expectations at the time of his discharge, are extensively discussed in the dissenting opinion to the panel decision. See Runnebaum v. NationsBank of Maryland, 95 F.3d 1285, 1297-1300, 1303-05 (4th Cir. 1996) (Williams, J., dissenting).

28

tions; and he failed to show that his termination took place under circumstances raising a reasonable inference of discrimination. We therefore affirm the district court's grant of summary judgment in favor of NationsBank. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993).**12**

III. THE ERISA CLAIM

In Conkwright v. Westinghouse Electric Corp., 933 F.2d 231, 239 (4th Cir. 1991), we concluded that to prevail on a § 510 ERISA claim, a plaintiff may resort to the proof scheme articulated by McDonnell Douglas. As goes Runnebaum's ADA claim, so goes his ERISA claim. For the same reasons that Runnebaum cannot establish a prima facie case under the ADA, he cannot establish a prima facie case under § 510. Accordingly, we affirm the grant of summary judgment in favor of NationsBank on Runnebaum's § 510 ERISA claim.

IV. CONCLUSION

We conclude that the district court properly granted summary judgment in favor of NationsBank. Runnebaum failed to establish a prima facie case of discrimination or to raise any genuine issues of fact sufficient to survive summary judgment. Even assuming that Runnebaum established a prima facie case of discrimination, NationsBank came forward with legitimate, nondiscriminatory reasons for firing

---

**12** Even if Runnebaum had succeeded at making out a prima facie case of discrimination, we conclude that NationsBank articulated legitimate, nondiscriminatory reasons for his discharge, and that Runnebaum failed to prove that those reasons were pretextual. See Runnebaum v. Nations-Bank of Maryland, 95 F.3d 1285, 1297-1300, 1305-07 (4th Cir. 1996) (Williams, J., dissenting). NationsBank terminated Runnebaum for failure to fulfill his sales goals and for failure to amend his unprofessional conduct. These are legitimate, nondiscriminatory reasons to discharge Runnebaum. See Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 330 (3rd Cir. 1995); Nitschke v. McDonnell Douglas Corp., 68 F.3d 249, 250-52 (8th Cir. 1995); Ray v. Tandem Computers, Inc., 63 F.3d 429, 433 (5th Cir. 1995). The district court therefore properly granted summary judgment in favor of NationsBank on this alternative ground. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993).

29

him, which Runnebaum failed to prove were pretextual. The opinion and order of the district court below is therefore affirmed.

AFFIRMED

HAMILTON, Circuit Judge, concurring in the judgment:

I agree with Judge Michael that NationsBank's concession that Runnebaum was disabled within the meaning of the Americans with Disabilities Act (ADA), see 42 U.S.C. § 12101-12213, prohibits our consideration of that issue on appeal. Accordingly, I concur in Part I. of Judge Michael's opinion. However, for the reasons stated in Part II.B.2. of Judge Williams' opinion, Runnebaum failed to establish a prima facie case of discrimination under the ADA. Furthermore, even if Runnebaum could establish a prima facie case under the ADA, for the reasons stated in Part II.B.2. of Judge Williams' opinion and her dissent to the panel majority opinion, see Runnebaum v. NationsBank of Maryland, 95 F.3d 1285, 1305-07 (4th Cir. 1996) (Williams, J., dissenting), Runnebaum failed to carry his ultimate burden of demonstrating that he was fired because of his disability. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 508-11 (1993). I therefore concur in the court's judgment.

MICHAEL, Circuit Judge, dissenting:

William Runnebaum was fired six months after he transferred into the trust department at NationsBank in Baltimore. He then brought suit against the bank under the Americans with Disabilities Act (ADA), alleging that he was fired because he is infected with the Human Immunodeficiency Virus (HIV). NationsBank moved for summary judgment claiming that it fired Runnebaum because of his performance rather than his disease, and the district court granted summary judgment on this theory. No one contested that Runnebaum's asymptomatic HIV infection was a "disability" for purposes of the ADA. Now, however, the majority concludes that Runnebaum's HIV infection is not a disability. It bases this holding on its textual reading of the ADA and its own conclusions about the state of the record. There is much that the majority must ignore, however, to affirm on the ground that Runnebaum is not disabled. First, it must ignore that NationsBank conceded Runnebaum's disability before the

30

district court. Second, it must ignore the physical effects of HIV upon the body even when the disease is in its asymptomatic stage. Third, it must ignore a wealth of legislative history and administrative interpretation contradictory to its reading. Finally, it must ignore evidence that NationsBank regarded Runnebaum as disabled-- evidence that is sufficient to create an issue of material fact.

I believe the majority means to create a per se rule excluding those with asymptomatic HIV from the protections of the ADA. It essentially admits as much, noting that its definition of disability "suggests that asymptomatic HIV infection will never qualify" as a disability. Ante at 18. And by finding that "the facts pertaining to this issue are sufficiently developed," ante at 11 n.4, even though Runnebaum has had no opportunity to present facts about disability, the majority shuts the door on whatever opportunity its opinion might have otherwise left open. The majority's rejection, in substance if not in form, of the case-by-case inquiry suggested by Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55 (4th Cir. 1995), moves this circuit even further from the mainstream of ADA interpretation. More importantly, it moves us completely away from the interpretation that Congress clearly intended. I therefore respectfully dissent.

I.

NationsBank conceded Runnebaum's disability in district court. In a memorandum supporting its motion for summary judgment, NationsBank acknowledged that Runnebaum "is a member of a protected class (HIV-positive being a protected category under 42 U.S.C. § 12102([2]))." J.A. 46. It repeated this concession in its reply brief, saying that Runnebaum "can establish the existence of only two of the four [elements of a prima facie case]-- he is in a protected group and he was discharged." J.A. 533. The district court accepted this concession and "assume[d], for the purposes of the [ ] motion, that even an asymptomatic HIV infection may be a disability within the act." J.A. 570. NationsBank again conceded this issue in its initial brief to this court. See Brief for Appellee at 19 ("[T]he plaintiff could establish the existence of only two of the four McDonnell Douglas elements -- he may have been in a protected group and he was discharged."). In its reply (before the en banc court) to the arguments of amici Whitman-Walker Clinic and the EEOC, NationsBank argued that "[t]heir

31

appearance to brief this issue is a distraction from the main issues of the case because the `disability' issue was not a ground for summary judgment below and was not briefed or argued on appeal to the panel." Appellee's Answer to the Briefs Amicus Curiae at 2.

"Ordinarily an appellate court does not give consideration to issues not raised below." Hormel v. Helvering, 312 U.S. 552, 556 (1941); see also Singleton v. Wulff, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). We have consistently noted the applicability of this general rule. See, e.g., Domino Sugar Corp. v. Sugar Workers Local Union 392, 10 F.3d 1064, 1068 (4th Cir. 1993); Liberty Corp. v. NCNB Nat'l Bank, 984 F.2d 1383, 1389 (4th Cir. 1993). NationsBank, by its concession in district court, has waived its right to assert non-disability as an alternative ground for affirming summary judgment. See United States v. Patrin, 575 F.2d 708, 712 (9th Cir. 1978) ("It is immaterial whether the issue was not tried in the district court because it was not raised or because it was raised but conceded by the party seeking to revive it on appeal.").

I know that "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." Singleton, 428 U.S. at 121. However, Singleton only recognized exceptions to the general rule in cases "where the proper resolution is beyond any doubt or where injustice might otherwise result." Id. (citations and quotations omitted). Some circuits have recognized an additional exception in cases "[w]hen the issue conceded or neglected in the trial court is purely one of law and either does not affect or rely upon the factual record developed by the parties or the pertinent record has been fully developed." Patrin, 575 F.2d at 712 (citations omitted). The majority appears to rely on this exception.[1] In

---

[1] The majority does not discuss the general rule set forth in Hormel and Singleton. It instead relies on the proposition that "we may affirm a district court's decision on different grounds than those employed by the district court." Shafer v. Preston Memorial Hosp. Corp., 107 F.3d 274, 275 n.1 (4th Cir. 1997); see also Jackson v. Kimel, 992 F.2d 1318, 1322 (4th Cir. 1993). There is no indication, however, in either Shafer or Jackson that the alternate grounds in those cases had been neglected or conceded before the district court.

discussing why it chose to reach the disability issue, the majority says that "[w]hether asymptomatic HIV infection is a disability under the statute is primarily a question of law, the facts pertaining to this issue are sufficiently developed, and the issue was briefed and argued on appeal." Ante at 11 n.4. This assertion by the majority is contrary to both the law of this circuit and the reality of how this case has been litigated.

Other courts have held that asymptomatic HIV is a per se disability that requires no development of the facts. See, e.g., Gates v. Rowland, 39 F.3d 1439, 1446 (9th Cir. 1994) (discussing Rehabilitation Act). Our decision in Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55 (4th Cir. 1995), however, rejected this approach. According to Ennis, "the plain language of [42 U.S.C. § 12102(2)] requires that a finding of disability be made on an individual-by-individual basis." Id. at 59. Thus, Ennis directs us to make "case-by-case determinations of whether a given impairment substantially limits a major life activity, whether an individual has a record of such a substantially limiting impairment, or whether an individual is being perceived as having such a substantially limiting impairment." Id. at 60. The majority specifically "reaffirm[s] our holding in Ennis; accordingly, a finding that Runnebaum has a disability under this provision must be made on an individualized basis." Ante at 12. I do not see how the majority can claim that the issue of Runnebaum's disability is "primarily a question of law" and then turn around and endorse Ennis's individualized inquiry.

The majority also asserts that "the facts pertaining to this issue [disability] are sufficiently developed." Ante at 11 n.4. This assessment is not fair to Runnebaum, who had no hint that he should have been developing or making a summary judgment record on disability. At the en banc oral argument Runnebaum's lawyer told us how Nations-Bank's concession on this issue affected his litigation strategy:

> The problem with this issue is because it was never raised below . . . nobody ever took any discovery on this question. And the record is pretty sparse on that whole issue.
>
> The record was not developed on that issue. It never became an issue.

33

Under the facts of this case, the bank has never taken the position, and one of the difficulties that I have here, and I wish I had a better record, is because it was never an issue anywhere. Maybe it should have been, but it wasn't. Nobody raised it. It was assumed that he met the standards under the Act to be disabled, and the whole case was premised, discovery and everything was premised from that point forward, on the fact that it was conceded that he was disabled. Now that may have been a mistake, but that's the state of the record.

En Banc Oral Argument, Mar. 5, 1997. These frank comments by Runnebaum's lawyer confirm that consideration of the disability issue on the current state of the record substantially prejudices Runnebaum's case.

Nevertheless, the majority proceeds to examine the merits of this issue on the current record and concludes, not surprisingly, that there is insufficient evidence to support a finding that Runnebaum is disabled. See ante at 18 ("Runnebaum produced no evidence showing that he was impaired, to any degree, during the relevant time period."); id. at 23 ("[T]here is no evidence in the record that Runnebaum, because of his infection, forewent having children or engaging in intimate sexual relations."); id. at 25 ("None of this evidence, however, is sufficient to create a genuine issue of fact concerning the perception of Runnebaum's HIV infection held by the relevant decisionmakers at NationsBank."); id. at 27 ("NationsBank did not regard or perceive Runnebaum as having [ ] an impairment [that substantially limited one or more of the major life activities], and the record does not contain evidence demonstrating otherwise."). The majority has somehow assumed that Runnebaum could present no other evidence on these points. But Runnebaum had no reason to proffer such evidence because his disability was not contested.**2**

_____

**2** In responding to my point that it is not fair to decide Runnebaum's case against him on an issue that was conceded by his opponent on summary judgment, the majority ignores the realities of litigation. It says that Runnebaum "knew that he bore the burden of developing a summary judgment record in support of his contention that he was" disabled, ante

By deciding the disability issue before Runnebaum has had an opportunity to lay out his case on it, the majority ignores the purpose for the general rule prohibiting consideration of an issue that was conceded in district court. The reason for the rule, as discussed by the Supreme Court in Hormel, is quite relevant to this case:

> For our procedural scheme contemplates that parties shall come to issue in the trial forum vested with authority to determine questions of fact. This is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide; it is equally essential in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence.

Hormel, 312 U.S. at 556. In Singleton the Court reversed the Eighth Circuit's decision to consider an issue not passed upon by the trial court. The Court said, "[w]e have no idea what evidence, if any, peti-

_____

at 9-10 n.4, and that "[t]here simply are no more facts to be developed" on this issue, id. at 10 n.4. Runnebaum was the plaintiff, however, and he surely had access to facts about his own condition. If Runnebaum had facts at his disposal to offer evidence of disability at trial or to offer affidavits (if they became necessary) in summary judgment proceedings, there was no need for him to take discovery on his own disability. The majority, of course, suggests that there are no facts available to support an affidavit showing disability and says that even if there were, such facts could not trump deposition testimony already taken. These assertions do not take the whole picture into account. First, there is some evidence in the deposition excerpts we have that the HIV virus had begun to attack Runnebaum's immune system. See post at 38 n.3 & 43 n.9. Second, we do not have access to all of the discovery that was taken. We only have deposition excerpts and documents that relate to the issues raised on summary judgment. Thus, we have no way of knowing if there is anything else in unfiled discovery material that bears on disability. Finally, we do not know what facts Runnebaum could present on disability if he had the chance. At bottom, I cannot understand why the majority insists on deciding an issue that the parties have not yet litigated, especially when it is not necessary to the disposition of this appeal.

35

tioner would, or could, offer in defense of this statute, but this is only because petitioner has had no opportunity to proffer such evidence." Singleton, 428 U.S. at 120. Moreover, even if the petitioner had no other evidence to present, he "should have the opportunity to present whatever legal arguments he may have in defense of the statute." Id. These factors compelled the Court to reverse, despite its acknowledgment that decisions about whether to consider an argument not raised below are usually left to the appellate court's discretion. See id. at 121.

If the majority feels that the disability issue is dispositive and must be addressed despite the concession in district court, it should at least remand the case for further proceedings on this issue. Better yet, the majority should accept the concession and reach only the issues that were presented below. That would be in line with how we have treated ADA cases on review of summary judgment in the past. In Ennis, for example, we found "no evidence" to support the conclusion that the individual with HIV had a disability under the ADA. Ennis, 53 F.3d at 60. Nevertheless, we said that "because the record as to any limitations on [the HIV-positive individual's] major life functions, or perceptions of any such limitations, may be less than fully developed at this stage of the litigation, we will assume for the purposes of this case that [he] was disabled under the Act." Id. Ennis was not the first time that we have made such an assumption. See Doe v. University of Maryland Med. Sys. Corp., 50 F.3d 1261, 1265 (4th Cir. 1995) ("The parties do not dispute that infection with HIV is a disability . . . ."). In its haste to address this question, however, the majority ignores the procedural posture of this litigation and makes the ill-founded assertion that Runnebaum has not offered sufficient evidence of disability. Before coming to such a conclusion, we at least owe Runnebaum the normal opportunity to offer evidence and legal argument on this issue.

II.

NationsBank's concession aside, there is sufficient support for Runnebaum's claim of disability to defeat summary judgment. Runnebaum is disabled under the ADA if he can meet the requirements of either 42 U.S.C. § 12102(2)(A) or § 12102(2)(C). I will discuss each of these provisions in turn.

36

A.

Section 12102(2)(A) defines the term "disability" with respect to an individual as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." The majority breaks this definition into two components: first, the individual must have a "physical or mental impairment," and second, that impairment must "substantially limit[ ] one of more of the major life activities of such individual." Runnebaum must satisfy both of these requirements to be disabled under § 12102(2)(A). The majority concludes that he can satisfy neither of them, but I disagree.

1.

The majority first holds that being infected with the HIV virus is not a physical or mental impairment if the virus produces no symptoms. Its analysis is quite straightforward: asymptomatic HIV infection is not an impairment because "without symptoms, there are no diminishing effects on the individual." Ante at 15. The majority recognizes that its analysis is contrary to two other circuits and the relevant legislative history. Moreover, the majority ignores the regulations that hold HIV to be a per se impairment. The majority therefore limits itself to its own interpretation of the text and argues that "the statutory meaning of `impairment' is plain and unambiguous." Id. at 17.

I accept the dictionary definitions of "impair" and "impairment" adopted by the majority. "Impair" is to "make worse by or as if by diminishing in some material respect," or "[t]o weaken, to make worse, to lessen in power, diminish, or relax, or otherwise affect in an injurious manner." Ante at 15. "Impairment" is a "decrease in strength, value, amount, or quality," a "deterioration" or a "lessening." Id. What the majority fails to recognize is that under any of these definitions, the effects of the HIV virus on the victim would constitute an "impairment." Medical researchers once believed that HIV lay dormant in the body after the initial infection. "It turns out, however, that the body and the virus engage in mortal combat from the beginning." Christine Gorman, Battling the AIDS Virus: There's Still No Cure, But Scientists and Survivors Make Striking Progress, Time, Feb. 12, 1996, at 62, 63. The virus attacks the victim's immune system imme-

37

diately; it enters the hemic (blood) and lymphatic systems and begins reproducing itself within a group of white blood cells knows as CD4 cells. See id. at 64 (describing how during the first stage "[t]housands of HIV particles are reproducing themselves" in CD4 cells); Martin A. Nowak, AIDS Pathogenesis: From Models to Viral Dynamics in Patients, 10 J. Acquired Immune Deficiency Syndromes & Human Retrovirology S1, S1 (Supp. 1 1995) ("After infection with HIV, patients initially enter the primary infection phase, which usually last for a few weeks and is characterized by very high viral levels and a decline in CD4 cell counts."). During this first stage, the infection may cause a mononucleosis-type illness known as acute retroviral seroconversion syndrome.**3** See Michael S. Saag, Natural History of HIV-1 Disease, in Textbook of AIDS Medicine 45, 46 (Samuel Broder et al. eds., 1994). After the disease's initial attack, the body's immune system begins a counterattack sufficient to stifle these initial symptoms. Even though the infected individual is asymptomatic, the virus continues to reproduce, slowly wearing away at the immune system until the final and fatal stage of the disease. See id. at 49 ("[A] slow progressive decline in CD4-positive cells is typically seen during this time."); Cecil Textbook of Medicine 1908 (James B. Wyngaarden et al. eds., 19th ed. 1992) ("HIV infection can therefore be considered a disease of the immune system, characterized by the progressive loss of CD4+ lymphocytes, with ultimately fatal consequences for the infected host."). Recent studies have shown that the focal point of HIV attack during the asymptomatic period is in the individual's lymph system. See Christine Gorman, The Exorcists: Applying a Potent Combination of New Treatments, Medical Researchers Are Determined to Expel the Terrible Specter of AIDS as an Invincible Disease, Time, Fall 1996, at 64, 65 ("The big fight [between HIV and the immune system] occurs in the harder-to-study lymph nodes, where day after day, year after year the body battles the virus to a standstill before finally exhausting its immunological reserves.").

_____

**3** There is evidence that Runnebaum experienced this syndrome. See J.A. 152 (testimony of Dr. Michael Pistole, Runnebaum's physician) ("[Runnebaum] had had this syndrome a couple of years before, which I almost think -- when you become HIV positive-- that what happens is that you go through a viral-like syndrome and it can last for months, or weeks to months, and be very bad. It can be like-- I'm just wondering if in 1986 that was the prodrome of HIV infection.").

The majority contends that this immediate impact on the immune system is at "so low a level of generality" that it does not actually constitute a "diminishing effect." Ante at 16 n.6. It views the terms "impairment" and "symptoms" as synonymous and therefore concludes that any asymptomatic disease cannot constitute an impairment. See ante at 15. Nowhere does the text of the statute, however, require a "physical impairment" to be outwardly visible or manifest. The effects of the HIV virus may not be noticeable to the outside world until the later stages of the disease, but the body is impaired as soon as the disease enters it.[4] As former Surgeon General C. Everett Koop said in a letter to the Justice Department:

> [F]rom a purely scientific perspective, persons with HIV infection are clearly impaired. They are not comparable to an immune carrier of a contagious disease such as Hepatitis B. Like a person in the early stages of cancer, they may appear outwardly healthy but are in fact seriously ill.

Letter from C. Everett Koop, M.D., Surgeon General, to Douglas W. Kmiec, Acting Assistant Attorney General, Office of Legal Counsel, Department of Justice, reprinted in 8 Fair Empl. Prac. Manual (BNA) No. 641 at 405:18, 405:19.[5]

In my opinion, HIV infection comfortably fits within the plain and

---

[4] The majority argues that if the effects of HIV can constitute an "impairment" under the ADA, then the ADA will soon extend to cover those diseases that "lurk in the genes, and perhaps the futures, of millions of apparently healthy people." Ante at 16 n.6. If a disease or condition merely "lurks" in one's genes or in one's future, it has no immediate health effect and therefore would not be considered an impairment. On the other hand, as soon as the HIV infection is contracted, it begins the process of causing serious damage to the immune system.

[5] We need not reach the issue of whether the contagiousness of HIV is sufficient on its own to constitute an impairment. In Doe v. University of Maryland Med. Sys. Corp., 50 F.3d 1261 (4th Cir. 1995), however, we found that the potential for HIV transmission disqualified an HIV-infected individual from serving as a surgeon. See id. at 1266 ("We hold that Dr. Doe does pose a significant risk to the health and safety of his patients that cannot be eliminated by reasonable accommodation.").

39

unambiguous meaning of impairment. Admittedly, however, the meaning of "impairment" is broad enough that it might be considered somewhat ambiguous. Cf. Torcasio v. Murray, 57 F.3d 1340, 1353 (4th Cir. 1995) (finding the ADA's textual definition of "disability" to be "unilluminating"), cert. denied, 116 S. Ct. 772 (1996). Even if the majority does not agree with my textual analysis, it must at least admit that this analysis is sufficiently plausible to make the statute ambiguous. It therefore should have turned to the legislative history for guidance. See Green v. Bock Laundry Machine Co., 490 U.S. 504, 508 (1989) ("Concluding that the text is ambiguous . . ., we then seek guidance from legislative history . . . ."); United States v. Irvin, 2 F.3d 72, 76-77 (4th Cir. 1993) ("[B]ecause the relevant statutory language is susceptible to interpretations other than the one suggested by the Government and is therefore ambiguous, we turn to the legislative history for assistance in ascertaining the intent of Congress."). One look at the legislative history, however, reveals why the majority clings to its textual analysis.

Both House and Senate committee reports clearly state that infection with the HIV virus is to be considered an impairment. House Report 101-485 states:

> It is not possible to include in the legislation a list of all the specific conditions, diseases, or infections that would constitute physical or mental impairments . . . . The term includes, however, such conditions, diseases, and infections as . . . infection with the Human Immunodeficiency Virus . . . .

H.R. Rep. No. 101-485, pt. 2, at 51, reprinted in 1990 U.S.C.C.A.N. 303, 333; see S. Rep. No. 101-116, at 22 (same). Part Three of the House Report reiterates that "[a]lthough the definition [of impairment] does not include a list of all the specific conditions, diseases, or infections that would constitute physical or mental impairments, examples include . . . infection with the Human Immunodeficiency Virus." H.R. Rep. No. 101-485, pt. 3, at 28, reprinted in 1990 U.S.C.C.A.N. 445, 451. The committee reports could not be clearer: infection with HIV constitutes an "impairment" under the ADA.**6**

---

**6** The majority argues that the reports' failure to differentiate between symptomatic and asymptomatic HIV means that Congress did not deter-

40

Because the committee reports are the "authoritative source for finding the Legislature's intent," Garcia v. United States, 469 U.S. 70, 76 (1984), the above-cited passages are decisive as to the intent of Congress. A survey of additional legislative history is significant, however, if only to show the breadth of the congressional presumption that individuals with HIV would be covered. Numerous members of Congress took to the floor to praise the ADA for its protection of HIV-infected individuals, including those who were asymptomatic. See, e.g., 135 Cong. Rec. S10768 (daily ed. September 7, 1989) (statement of Sen. Kennedy) (noting that "in the particular provision of the legislation we have pointed out very clearly, if you are asymptomatic and HIV positive, you are protected"); 136 Cong. Rec. H2626 (daily ed. May 22, 1990) (remarks of Rep. McDermott) ("I am particularly pleased that this act will finally also extend necessary protection to people with HIV disease. These are individuals who have any condition along the full spectrum of HIV infection-- asymptomatic HIV infection, symptomatic HIV infection or full-blown AIDS."); 136 Cong. Rec. H4623 (daily ed. July 12, 1990) (remarks of Rep. Owens) ("As I noted, the ADA will offer critical protection to people with HIV disease in a range of areas. People with HIV disease are individuals who have any condition along the full spectrum of HIV infection -- asymptomatic HIV infection, symptomatic HIV infection or full-blown AIDS."); 136 Cong. Rec. H4626 (daily ed. July 12, 1990) (remarks of Rep. Waxman) ("People with HIV disease are those who have the spectrum of the disease -- from asymptomatic HIV infection, to symptomatic HIV infection, to full-blown AIDS. . . . All such individuals are covered under the first prong of the definition of disability in the ADA.").

The legislative history plainly demonstrates that Congress intended for HIV to be considered a disability. Indeed, it is difficult to imagine a case in which the legislative history could be more explicit.

Although the majority acknowledges that the legislative history is contrary to its interpretation of "impairment," it does not discuss the

_____

mine whether asymptomatic HIV was an impairment. I believe, however, that Congress's failure to differentiate counsels against the majority's interpretation, not for it. In other words, Congress purposely declined to differentiate because it wanted no differentiation to be made.

41

many administrative regulations which have interpreted the term. Congress gave the EEOC authority under 42 U.S.C. § 12116 to issue regulations with respect to subchapter I, the statutory subchapter regarding employment.**7** <u>See Torcasio</u>, 57 F.3d at 1353 ("The [ADA and the Rehabilitation Act] do not define `physical or mental impairment' or `major life activity,' instead leaving that task to the applicable regulations."). The EEOC has issued extensive regulations defining the terms used in the ADA, including "physical or mental impairment." Although the regulations themselves do not specifically mention HIV, 29 C.F.R. § 1630.2(h)(1) does include in the definition of impairment "any physiological disorder, or condition . . . affecting one or more of the following body systems: . . . hemic and lymphatic." As discussed above, the HIV virus attacks the hemic and lymphatic systems as soon as it enters the body. Thus, the HIV infection clearly fits within the regulatory definition of impairment.**8**

---

**7** Section 12102 is located immediately before subchapter I, which begins at § 12111. Thus, the definition of "disability" provided in § 12102(2)(A) is not specific to the employment subchapter; it instead applies to the whole ADA. In <u>Ennis</u> the court expressed uncertainty as to whether the EEOC had the authority to promulgate a regulation concerning the definition of "disability" provided in § 12102(2)(A) or any of the terms within that definition (such as "impairment") since § 12102(2)(A) is not located within subchapter I. <u>See Ennis</u>, 53 F.3d at 60 n.4. Because Congress delegated to the EEOC the authority to issue regulations for the employment subchapter, I believe it reasonable to assume that Congress intended for the EEOC to define impairment in cases, such as this one, brought under the employment subchapter. <u>See</u> 42 U.S.C. § 12116 (directing the EEOC to issue regulations in order to "carry out this subchapter").

If 42 U.S.C. § 12116 can be considered a direct grant of congressional authority to define impairment in the employment context, then the EEOC's definition must be given "controlling weight" if the statute is otherwise ambiguous. <u>See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 844 (1984). Even if Congress did not grant the EEOC direct statutory authority to define impairment, however, we still must defer to the EEOC's regulations if they are a "reasonable interpretation" of the statute. <u>See id.</u> (requiring deference to a reasonable interpretation if the legislative delegation to an agency is "implicit rather than explicit").

**8** Other agencies have been even clearer by directly including HIV infection in their interpretation of "impairment." <u>See</u> 28 C.F.R. § 35.104

42

The majority attempts to shore up its interpretation of "impairment" by claiming that "Runnebaum produced no evidence showing that he was impaired" and that "Runnebaum does not assert that he suffers an actual physical or mental impairment because of his HIV infection." Ante at 18. As I said in part I, however, Runnebaum never had the occasion to make such assertions or to produce such evidence because this issue was not contested in district court. The majority also points to Runnebaum's application for a transfer to the trust department, where he checked a box indicating he was not handicapped. Such a check mark has little relevance to whether Runnebaum has an "impairment" under 42 U.S.C. § 12102(2)(A). His decision not to check the "handicapped" box could have been based on his assumption that he could physically perform the job in trusts. Moreover, Runnebaum might have feared that the bank would be prejudiced against him if it knew that he was HIV-positive. Finally, the analysis of Runnebaum's doctor that Runnebaum "had no ill effects from the disease or the medications" merely means that Runnebaum remained asymptomatic. As discussed above, the lack of symptoms does not mean that Runnebaum was not impaired.[9]

_____

(Department of Justice) ("The phrase physical or mental impairment includes . . . HIV disease (whether symptomatic or asymptomatic) . . . ."); 28 C.F.R. § 36.104 (Department of Justice) (same); 29 C.F.R. § 34.2 (Department of Labor) (same); 34 C.F.R.§ 1200.103 (National Council on Disability) (same); 7 C.F.R. § 15e.103 (Department of Agriculture) (same); 5 C.F.R. § 1636.103 (Federal Retirement Thrift Investment Board) (same); 22 C.F.R. § 1701.103 (Institute of Peace) (same); 45 C.F.R. § 2301.103 (Arctic Research Commission) (same); 24 C.F.R. Ch. I, Subch. A, App. I § 100.201 (Department of Housing and Urban Development) (adding HIV infection to list of physical and mental impairments).

[9] Moreover, Dr. Pistole makes clear that he has provided "aggressive treatment" of Runnebaum's HIV infection through the use of "chain breaker type drugs." J.A. 155. In Harris v. H & W Contracting Co., 102 F.3d 516 (11th Cir. 1996), the court held that the determination of whether a person is disabled must be made "without regard to mitigating measures such as medicines." Id. at 520 (quoting 29 C.F.R. pt. 1630, app. § 1630.2(j)). Runnebaum's condition would likely be far worse if he was not taking the medication prescribed by Dr. Pistole. There is also evidence that the medication took its own toll on Runnebaum. See J.A. 84 (testimony of Runnebaum) ("[T]here were days that I felt very, very up and there were other days that I didn't feel very good at all. That's the effect of the drugs.").

43

In sum, the majority's interpretation cannot withstand the stark realities of asymptomatic HIV, the direct and unambiguous legislative history, and the administrative regulations, all of which confirm that Runnebaum was impaired.**10**

2.

The second requirement of 42 U.S.C. § 12102(2)(A)'s definition of disability is that the individual's impairment must "substantially limit[ ] one or more of the major life activities of such individual." Although Runnebaum himself did not offer argument or evidence on this question, amici EEOC and the Whitman-Walker Clinic Legal Services Department contend that the HIV virus substantially limits the major life activities of procreation and intimate sexual relations. The majority, although "not certain" and "not convinced" that procreation and intimate sexual relations are major life activities under the ADA, assumes that they are. Ante at 20. However, it finds that Runnebaum's participation in these activities is not substantially limited by his HIV infection.

The question of whether procreation and intimate sexual relations are "major life activities" under the ADA is admittedly "not free from doubt." Abbott v. Bragdon, 107 F.3d 934, 939 (1st Cir. 1997) (discussing procreation). The words of the statute, however, are certainly broad enough to include these activities. Procreation is perhaps the most important life activity, since we would cease to exist as a species if we no longer reproduced. See id. at 940 (finding that "reproduction . . . is both the source of all life and one of life's most important activities"). And intimate sexual relations, while less important in nature's scheme, have consumed enough of humanity's energy and interest to count among such activities.

The phrase "major life activity" is sufficiently ambiguous to require a look at the legislative history and the implementing regulations for interpretive guidance. Once again, the legislative history speaks authoritatively about its meaning. The House Committee Report says

_____

**10** The majority attempts to characterize some of my frank, step-by-step analysis as concession. See ante at 13. In the end, however, the grim and disabling nature of asymptomatic HIV is undeniable.

44

that "a person infected with the Human Immunodeficiency Virus is covered under the first prong of the definition of the term `disability' because of the substantial limitation to procreation and intimate sexual relationships." H.R. Rep. No. 101-485, pt. 2, at 52, reprinted in 1990 U.S.C.C.A.N. 303, 334. Thus, the legislative history confirms not only that procreation and intimate sexual relationships are major life activities but also that such activities are substantially limited by HIV.

The regulations are less decisive but also offer support for amici's position. Procreation and intimate sexual relations are not included in the list of major life activities. See 29 C.F.R. § 1630.2(i) ("Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."). However, by beginning its list with the words "such as," the regulation indicates that its list is not intended to be exclusive. See also 29 C.F.R. pt. 1630, app. § 1630.2(i) ("This list is not exhaustive."). The appendix to the regulations specifically states that "[o]ther impairments, . . . such as HIV infection, are inherently substantially limiting." Id. pt. 1630, app. § 1630(j) (discussing the definition of "substantially limits"). Since we must give an agency's interpretation of its own regulation "controlling weight unless it is plainly erroneous or inconsistent with the regulation," Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (quotations omitted), the EEOC's interpretation resolves the issue.

The majority nevertheless holds that asymptomatic HIV does not substantially limit procreation or intimate sexual relations for purposes of the ADA. The majority bases this holding on a distinction it draws between an impairment that is substantially limiting as a physical matter and an impairment that is substantially limiting as a behavioral matter. According to the majority, an impairment is only a disability under the ADA if it is substantially limiting as a physical matter. In other words, the impairment must render the individual physically incapable of performing the activity.

While it has some intuitive plausibility, this distinction is nowhere within the text, legislative history, or regulatory interpretation of the ADA. The text only requires "a physical or mental impairment that substantially limits one or more of the major life activities." There is

45

no requirement that the impairment physically limit the life activity, nor is there any specification about how the impairment must substantially limit that activity. Once again, the majority has no authority to bolster its interpretation. The legislative history makes no mention of such a distinction and, as noted above, says specifically that HIV does substantially limit procreation and intimate sexual relationships. The EEOC regulations do not draw such a distinction; they instead create a broad definition that easily covers asymptomatic HIV. See 29 C.F.R. § 1630.2(j)(ii) (defining "substantially limits" in part as "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity"). And, as noted above, the EEOC's interpretation of its regulations directly states that HIV is "inherently substantially limiting." 29 C.F.R. pt. 1630, app. § 1630(j).

Moreover, the majority's distinction goes against common sense. The majority claims that "as a physical matter, nothing inherent in the virus substantially limits procreation or intimate sexual relations." Ante at 22 (emphasis in original). It is HIV's physical effects, however, upon procreation and intimate sexual relations that make it substantially limiting. An individual with HIV stands a significant chance of infecting others if he engages in these activities, and this prospect of spreading the disease is a substantial limitation. See Memorandum from Douglas W. Kmiec, Acting Assistant Attorney General, Office of Legal Counsel, to Arthur B. Culvahouse, Jr., Counsel to the President (Sept. 27, 1988), reprinted in 8 Fair Empl. Prac. Manual (BNA) No. 641 at 405:1, 405:7 [hereinafter Kmiec Memorandum] ("There is little doubt that procreation is a major life activity and that the physical ability to engage in normal procreation -- procreation free from the fear of what the infection will do to one's child -- is substantially limited once an individual is infected with the AIDS virus.").[11] As the

---------------------------------------------------------------

[11] The majority goes to great pains to try to distinguish the Kmiec Memorandum. See ante at 21-22. In support of its position, the majority quotes the memorandum as stating "there is nothing inherent in the [HIV] infection which actually prevents either procreation or intimate relations." Ante at 22 (quoting Kmiec Memorandum at 405:7). The majority takes this quotation out of context, however, and thereby dis-

46

court said in <u>Abbott</u>, "[n]o reasonable juror could conclude that an 8% risk of passing an incurable, debilitating, and inevitably fatal disease to one's child is not a substantial restriction on reproductive activity." <u>Abbott</u>, 107 F.3d at 942.**12**

The majority also claims that even if individuals with asymptomatic HIV can be substantially limited in a major life activity, Runnebaum has presented no evidence that he himself has been so limited. Once again, however, the majority is using the fact that NationsBank conceded this issue in district court to prejudice Runnebaum in this court. Regarding procreation, the majority notes that "nothing in the record so much as suggests that Runnebaum was at all interested in fathering a child." <u>Ante</u> at 23. Of course, since his disability was uncontested in district court, he had no reason to offer such evidence in the summary judgment proceedings. Regarding intimate sexual relations, the majority makes this bold assertion: "the record makes clear that Runnebaum's ability to engage in intimate sexual relations was not substantially limited by his HIV infection; the record shows that he concealed his HIV infection from his lover." <u>Ante</u> at 23. That is too much of a leap for me. I would not presume to know the status of Runnebaum's "intimate sexual relations" merely because he has a boyfriend. Again, Runnebaum has had no occasion or reason to testify about the effect that HIV has had upon his sexual relations.

_____

torts its meaning. The actual sentence is: "Thus, it might be asserted that there is nothing inherent in the infection which actually prevents either procreation or intimate relations." Kmiec Memorandum at 405:7. This sentence is followed by a footnote, which states: "As indicated in the text, we think this argument is disingenuous at least insofar as infection physically precludes the normal procreation of healthy children." <u>Id.</u> at 405:7 n.13.

**12** The <u>Abbott</u> court noted that a pregnant woman with HIV stands an 8% chance of viral transmission to her child if she was taking the drug azidothymidine (AZT) and a 25% chance of transmission if not taking AZT. <u>Abbott</u>, 107 F.3d at 942. Although the court did not specify the source of this information, it presumably was based on evidence in the case. Since NationsBank did not contest disability, we have no evidence in this case as to the risk of transmission from a man to his child or his sexual partner.

3.

The majority has effectively amended 42 U.S.C. § 12102(2)(A) to exclude individuals with asymptomatic HIV. It effects this result through a dizzying flurry of alternate holdings: asymptomatic HIV is never an impairment; even if it can be an impairment, Runnebaum has not proven that he is impaired; even if it always is an impairment, then it does not substantially limit major life activities; even if it can substantially limit major life activities, Runnebaum has not proven that he is so limited. These alternate holdings might betray an uncertainty on the majority's part, but they do not lessen the authority of any particular holding. The majority's opinion must be taken for what it is: a per se rule that excludes those with asymptomatic HIV from the protections of the ADA. This result runs counter to the statutory text, medical research, legislative history, administrative regulations, and even our decision in Ennis. This result is plainly wrong.

B.

Runnebaum could alternatively be protected under the ADA if he meets the requirements of 42 U.S.C. § 12102(2)(C). That provision defines a disability as "being regarded as having such an impairment." The "such an impairment" language apparently refers to the definition of impairment in § 12102(2)(A): "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." EEOC regulations provide three ways that an individual may be regarded as having "such an impairment:"

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such an impairment; or

> (3) Has none of the impairments defined in . . . this section but is treated by a covered entity as having a substantially limiting impairment.

48

29 C.F.R. § 1630.2(l).

The majority holds that none of the evidence produced by Runnebaum "is sufficient to create a genuine issue of fact concerning the perception of Runnebaum's HIV infection held by the relevant decisionmakers at NationsBank." Ante at 25. The majority discusses three items of evidence on this issue: the opening of Runnebaum's AZT packages by bank employees, Michael Brown's reaction to the news of Runnebaum's HIV status, and Ann Pettit's ultimate decision to fire Runnebaum. It then concludes that this evidence does not preclude summary judgment. In reaching this conclusion, however, the majority understates the evidence showing that Runnebaum was regarded as disabled, and it inexplicably makes inferences in favor of NationsBank. When Runnebaum's evidence is considered fully and all reasonable inferences are made in his favor (a must on summary judgment), it becomes clear that there is a genuine factual issue about whether the bank considered Runnebaum to be disabled.

Runnebaum never explicitly addressed this issue, since it was not raised in district court. However, he did produce evidence relevant to the issue that was contested, namely, whether NationsBank fired him because of his HIV-positive status. This evidence is also relevant to whether NationsBank regarded Runnebaum as being disabled. After all, if the bank fired Runnebaum because of his HIV status, then it must have regarded him as substantially limited in his ability to work.

There is not a great deal of direct evidence that the bank regarded Runnebaum as disabled. This should not be surprising, however, because "only rarely will a plaintiff have direct evidence of discrimination." Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996). Moreover, we are only concerned at this stage with whether there is a material issue of fact. Runnebaum's direct evidence is the testimony of Michael Brown, the bank's Baltimore city manager for the trust department. Brown was the senior managing officer for the group in which Runnebaum worked, and Runnebaum's correspondence was sent out over Brown's signature. Brown also stayed in close contact with Ann Pettit, Runnebaum's departmental supervisor, and Brown advised Pettit extensively on Runnebaum's performance. One night, on a social occasion, Runnebaum told Brown of

49

his HIV-positive status. Brown described his reaction to the news as follows:

> My feeling about that whole evening, I mean, it almost knocked the wind out of me, because I had never been in a situation and had never known anybody on a daily basis or knowingly worked with anybody, and it never crossed my mind.
>
> . . . . And I can remember just thinking -- I remember being in a state of panic, panic because I was thinking how am I going to work, you know, and be a friend to somebody who is HIV positive. I've educated myself a lot since then. But, you know, suppose he dies on me. Should I tell Ann[Pettit] at this point, should I tell the bank? I remember feeling panicky, uncontrolled.

J.A. 507-08. This direct evidence is bolstered by a variety of circumstantial evidence that NationsBank regarded Runnebaum as disabled. First, there is evidence that the bank knew of Runnebaum's HIV status. Obviously, Brown knew that Runnebaum was HIV-positive, and Brown passed this information on to Pettit at some point before Runnebaum was fired.[13] In addition, Runnebaum ordered a prescription for the drug azidothymidine (AZT) through the bank health plan, and packages of AZT that were delivered to the bank were twice opened by bank personnel. Second, there is evidence that the reasons given for Runnebaum's firing were pretextual. The following is a brief summary of such evidence.

> - When Runnebaum first came to NationsBank, he worked in the private banking department. When he applied for a position in the trust department, bank policy dictated that he could only be considered for the transfer if he was "performing at a satisfactory level or above in [his]

_____

[13] It is unclear when Brown told this to Pettit. Pettit believes it was "[p]robably towards the end of November," J.A. 317, and Brown thinks that he told her at an early December meeting with Philip Cawley, NationsBank's personnel manager. However, Cawley is emphatic that this information was not discussed at the December meeting.

current position." J.A. 276. Runnebaum's supervisor certified that his performance met this requirement, stating that he had "good skills and is a valuable member of the PB [private banking] team." J.A. 276.

- Ann Pettit claims that she made the decision to fire Runnebaum in early November 1992. However, she made no record of this decision, nor did she counsel Runnebaum that his job was in serious jeopardy. After she supposedly made this decision, she placed Runnebaum in charge of planning and hosting the major marketing event of the year, NationsBank's "Greater Baltimore Holiday Reception," which had a $10,000 budget and involved over 400 clients, potential clients, and those who could refer clients. Additionally, she sent Runnebaum a note on December 9 that said: "William-- I'm thrilled that you're a part of our group. I look forward to seeing you shine." J.A. 431.

- In a January 7, 1993, memorandum written by Pettit describing the reasons for Runnebaum's firing, she claims that he failed to attend a sufficient number of "prospect" sales calls. However, Runnebaum was denied credit for calls he made with Brown and Sara Tapiero, a portfolio manager, as well as those he made alone. He was even denied credit for three calls (he made alone) that resulted in actual sales. Another employee in the same sales position as Runnebaum, Clifford Andersson, was given credit for calls he made with Brown and Tapiero, as well as those he made alone.

- Runnebaum had nearly $5 million in sales by the end of 1992, which brought $21,900 in fees to the bank. Although this fell short of the targeted $40,000 in fees, Andersson had the same target and only brought in $275,000 in sales and $2,750 in fees. Andersson was not fired. Andersson also shared Runnebaum's alleged failure to submit timely activity and sales call reports. Pettit acknowledged that "both of them had slacked off" early

51

in their tenure. J.A. 371. She counseled both men, and the timeliness of their reports thereafter improved.

- Runnebaum also provided evidence to dispute the other reasons for his firing listed in Pettit's January 7 memorandum. Pettit faulted Runnebaum for failing to attend any meetings of the Baltimore Estate Planning Council, but no meetings were scheduled during Runnebaum's tenure in trusts. Pettit also said that Runnebaum failed to send copies of his correspondence to her, but all of Runnebaum's correspondence went out over Brown's signature and Runnebaum "feel[s] certain" that he told Pettit about this arrangement. J.A. 240. Regarding Pettit's complaints about his allegedly inappropriate behavior, Brown recalled that Pettit's initial reaction was that "he is young" and "he has got to learn that it is okay not to say anything." J.A. 66. Additionally, it made no sense for Pettit to assign Runnebaum responsibility for an important public relations effort, the holiday reception, if she was concerned about how he would conduct himself.

In sum, Runnebaum has presented evidence that the bank knew of his HIV status, that the reasons given for his firing were pretextual, and that a senior bank officer was "panicky" and "uncontrolled" when he learned of Runnebaum's HIV status. This evidence creates an issue of material fact as to whether Runnebaum was "regarded as" having a disability.

The majority's analysis of the evidence on this issue is flawed in several respects. First, it understates the evidence that supports Runnebaum's position. It ignores most of the circumstantial evidence and takes the "divide and conquer" approach to the rest, analyzing it in pieces rather than considering it as a whole. Second, it only finds Brown's testimony relevant to show that the bank was aware of Runnebaum's HIV status. However, Brown's "panicky" reaction to Runnebaum's revelation shows that at least one bank officer may have regarded Runnebaum as disabled. Finally, and most inexplicably, the majority finds that Pettit definitely decided to fire Runnebaum on November 3, 1992. The majority talks about this finding as if it was

52

uncontroverted fact. See ante at 26 ("Although Pettit knew that Runnebaum was HIV-positive when she discharged him, she did not possess this knowledge when she decided to fire him on November 3, 1992." (emphasis in original)). The timing of Pettit's decision, however, is sharply contested by the parties, and there is considerable circumstantial evidence that she did not decide to fire him on November 3. More than two months elapsed between her supposed date of decision and Runnebaum's ultimate discharge. She never warned Runnebaum that his job was in serious jeopardy. Moreover, after she supposedly decided to fire Runnebaum, she immediately assigned him an important marketing project and she sent him a glowing note saying she was "thrilled" that he was part of her team. Although Pettit and Brown did testify that Pettit made the discharge decision on November 3, the majority never explains why their testimony must be believed when it is contradicted by Pettit's own actions reflecting confidence in Runnebaum. The majority's unquestioning acceptance of Pettit's testimony cuts against the most basic principle of summary judgment: "all justifiable inferences are to be drawn in [the non-movant's] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The majority states this principle, see ante at 7, but then fails to follow it in this most important instance.

It may be that "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action." Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir. 1996). Runnebaum presents much more, however, than mere evidence that NationsBank knew he was HIV-positive. He presents strong circumstantial evidence that the reasons offered by the bank for his termination were pretextual, and he presents direct evidence that he was regarded as disabled. Although a jury could reasonably find against Runnebaum, there is sufficient evidence here to create an issue of material fact.

III.

The majority's determination that Runnebaum does not have a disability would dispose of the case. However, the majority does not limit itself to the series of holdings that make up its disability determination. It goes on to hold that Runnebaum did not meet the legitimate

53

expectations of NationsBank, that Runnebaum cannot raise a reasonable inference of unlawful discrimination, and that the bank articulated legitimate, non-discriminatory reasons for Runnebaum's discharge, reasons Runnebaum failed to prove were pretextual. All of these additional holdings are based on the same premise: that Runnebaum "did not meet NationsBank's legitimate expectations for his employment." Ante at 27.

As I outline above in part II.B., Runnebaum presents significant evidence that he met NationsBank's legitimate expectations and that the reasons provided for his firing were pretextual. Before Runnebaum transferred to the trust department, his supervisor in the private banking department certified that he was performing satisfactorily and was "a valuable member of the [private banking] team." J.A. 276. While in trusts Runnebaum made nearly $5 million in sales, bringing $21,900 in fees to the bank. Although these amounts fell short of the targets set by Pettit, Runnebaum did much better than Andersson, who was not fired. Runnebaum also supervised two important NationsBank marketing events which went off well.[14] Concerning Runnebaum's alleged failure to make the targeted number of sales calls, Runnebaum was denied credit for many of the sales calls he made, but Andersson received credit when he made similar calls. Runnebaum's failure to attend any meetings of the Baltimore Estate Planning Council can be explained by his assertion that no such meetings were held during his tenure in trusts, and he explains his failure to send copies of his correspondence to Pettit by indicating that she knew his correspondence was reviewed by Brown. Finally, concerning his allegedly inappropriate behavior, Runnebaum contends that his behavior was not out of line with the general tone of the office, which was "highly energized" and prone to "a lot of horseplay." J.A. 569. It would also make little sense for Pettit to assign Runnebaum responsibility for important marketing events if she was concerned about inappropriate behavior.

_____

[14] In addition to the "Greater Baltimore Holiday Reception" discussed above, Runnebaum planned a reception for McGuire, Woods, Battle & Boothe, a law firm that could refer trust business to the bank. After the latter reception Brown sent Runnebaum a handwritten "note of thanks and congratulations" for handling the event. J.A. 432.

In order to survive summary judgment, Runnebaum must forecast evidence showing a genuine issue of material fact on the ultimate question of pretext and discrimination. See Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993). He has done so. Runnebaum's evidence, if believed at trial, supports reasonable "disbelief of the reasons put forward by the defendant" and "rejection of the defendant's proffered reasons," which would permit a reasonable finder of fact to "infer the ultimate fact of intentional discrimination." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993). I would therefore reverse the district court's grant of summary judgment and remand for trial.**15**

IV.

When Congress was considering enacting civil rights legislation for those with disabilities, the Presidential Commission on the HIV Epidemic made the following plea:

> Comprehensive Federal anti-discrimination legislation, which prohibits discrimination against persons with disabilities in the public and private sectors, including employment, housing, public accommodations, and participation in government programs should be enacted. All persons with symptomatic or asymptomatic HIV infection should be clearly included as persons with disabilities who are covered by the anti-discrimination protections of this legislation.

S. Rep. No. 101-116, at 19. It is apparent from the ADA's voluminous legislative history that Congress thought the ADA accomplished this. It was not alone. President Bush "call[ed] on the Congress to get on with the job of passing a law -- as embodied in the Americans with Disabilities Act -- that prohibits discrimination against those with HIV and AIDS." Remarks by President Bush to Business Leadership, March 29, 1990, reprinted in 136 Cong. Rec. S9545 (daily ed. July 11, 1990). The subsequent regulations which define HIV to be a disability reinforce the scope of this consensus.

---

**15** Since, as the majority says, "[a]s goes Runnebaum's ADA claim, so goes his ERISA claim," ante at 29, I would also reverse the grant of summary judgment to the bank on the ERISA claim.

55

The majority's decision amounts to an outright repeal of Congress's effort through the ADA to fight discrimination against those with asymptomatic HIV. Again, I respectfully dissent.

Judges Hall, Murnaghan, Ervin, and Motz join this dissent.

56